**Barry YELLEN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**Ralph F. HAKE; George C. Moore; and Maytag Corp., Defendants.**

No. 4:05–cv–00388.

United States District Court, S.D. Iowa, Central Division.

July 7, 2006.

Thomas A. Hargett, Maddox Hargett & Caruso, Fishers, IN, George A. LaMarca, Justin E. LaVan, LaMarca & Landry, Des Moines, IA, Ralph M. Stone, Shalov Stone & Bonner LLP, New York City, for Plaintiff.

George T. Conway, III, Dimitry Joffe, Eric M. Roth, Wachtell Lipton Rosen & Katz, New York City, Lance Winfield Lange, Edward M. Mansfield, Belin Lamson Mccormick Zumback & Flynn, P.C., Des Moines, IA, for Defendants.

## ORDER

PRATT, Chief Judge.

Before the Court is Defendants' Motion to Dismiss Amended Class Action Complaint (Clerk's No. 17), pursuant to Federal Rule of Civil Procedure 12(b)(6) and 15 U.S.C. § 78u–4. Plaintiff resisted the Motion (Clerk's No. 23) and Defendants replied (Clerk's No. 29). A hearing was held on May 15, 2006, and the matter is fully submitted.

The present putative class action lawsuit was brought by Barry Yellen ("Plaintiff") on behalf of himself and on behalf of a class consisting of persons who purchased or acquired the common stock of Maytag Corporation ("Maytag") between March 7, 2005, and April 21, 2005. The Amended Complaint (Clerk's No. 16) asserts a claim for violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against Maytag, and a claim for violation of § 20(a) of the Exchange Act against Defendants George C. Moore ("Moore") and Ralph F. Hake ("Hake").

## I. FACTUAL BACKGROUND

The facts as alleged in the Amended Complaint are as follows. On March 7, 2005, Maytag issued a press release announcing that the Company "reaffirmed its business strategies and guidance during the 26th Annual Raymond James Institutional Investors Conference [hereinafter "James Investors Conference"] in Orlando, Florida. . . ." Amended Compl. ¶ 17. The press release quoted Hake and Moore on various aspects of Maytag's claimed cost savings, and included positive remarks about Maytag, stating that at the conference, "Maytag executives reaffirmed plans to achieve improved earnings in 2005, expected by the company to be in the range of $1.10 to $1.30 per share, including about 5 cents of restructuring charges." *Id.* Plaintiff claims that by "reaffirming" estimates, "defendants deliberately sought to bolster confidence in earnings estimates that defendants themselves did not genuinely believe and as to which criticism concerning lack of accuracy had been highlighted at internal board of directors meetings in the prior two weeks." *Id.*

The allegedly false and misleading statements by Defendants regarding Maytag's anticipated earnings were repeated in investor conferences during a "roadshow" that coincided with the press release. *Id.* ¶ 18. The roadshow consisted of three presentations by Hake and Moore. *Id.* The first presentation was on March 7, 2005, at the James Investors Conference. *Id.* The second presentation was on March 9, 2005, at Smith Barney's 18th Annual Global Industrial Manufacturing Conference (hereinafter "Smith Barney Conference") in New York. *Id.* The third and final presentation was on March 10, 2005, at J.P. Morgan's Small Cap Conference in Chicago (hereinafter "Morgan Conference"). *Id.* Each of the presentations was simulcast over the Internet. *Id.*

According to Plaintiff, the press release and remarks made by Hake and Moore at the various presentations were knowingly or recklessly false and misleading because Defendants were aware that Maytag's internal forecasts were lower than the public forecasts. *Id.* ¶ 19. Moreover, Plaintiff claims that Defendants were aware that:

> [N]umerous factors were negatively impacting the Company throughout the first quarter of the year and ... would be expected to negatively impact the Company such that the specific guidance provided by the defendants in the press release and at the conference was knowingly or recklessly overstated by a material amount. By the time of this press release and the related presentations, the defendants were aware that the bulk of the first quarter was over and that several negative factors—including significantly higher raw material prices and other high costs—were negatively impacting the Company. Following the release of this press release, the price of Maytag stock rose from a close of $14.70 per share on Friday, March 4, 2005, to a close of $15.93 per share on Monday[,]

March 7, 2005, on unusually high volume.

*Id.* "Indeed, [Defendants] were acutely aware that raw material costs were higher because they had materially impacted prior quarterly results and were continuing to significantly drag on earnings, and defendants were especially aware of the impact these factors among others had on the valuation of the Company's stock because it was affecting the valuation of the Company in a major transaction being considered and negotiated at the time." *Id.* ¶ 20. Plaintiff claims that Defendants were also aware that the company's earnings forecasts were not accurate or reliable, and that previous forecasts for January and February 2005 had not been achieved. *Id.* According to Plaintiff, these issues were "repeated topics of discussion at Maytag's board of directors meeting in February 2005." *Id.* Thus, while Defendants made numerous other disclosures during the proposed class period, Plaintiff claims they took no action to correct the misleading information they placed on the market in and around March 7, 2005, until after the close of trading on April 21, 2005. *Id.*

On April 22, 2005, prior to the market opening, Defendants announced that Maytag's first quarter financial results for 2005 had "plunged by 80%." *Id.* ¶ 21. In correcting its previous earnings guidance, Maytag lowered its 2005 net income forecast to a range of $0.45 to $0.55 per share. *Id.* In response to the news, the price of Maytag stock dropped from a close of $15.10 per share on April 21, 2005, to $10.89 per share on April 22, 2005, with over 17 million shares traded. *Id.* ¶ 22. On April 26, 2005, Hake internally shared his view with Maytag's Board of Directors that it would take two to three years for Maytag to achieve an earnings turnaround. *Id.* ¶ 23.

After market closing on May 19, 2005, Maytag announced that it was being purchased in a "going-private transaction led by Ripplewood Holdings LLC" at a price of $14.00 per share. *Id.* ¶ 23. According to Plaintiff, various filings with the Securities and Exchange Commission ("SEC") make it clear that the process leading up to the Ripplewood transaction "was being negotiated at the time of Maytag's fraudulent March 7, 2005 reaffirmation of grossly overstated earnings projections." *Id.* ¶ 24. Specifically, Plaintiff contends that a May 20, 2005, Salomon Smith Barney report valued Maytag's shares at $14.00 per share when taking into account "a significant premium associated with the going private transaction." *Id.* Additionally, Ripplewood had signed a confidentiality agreement with Maytag in September 2004, permitting it to examine Maytag for the purposes of making the May 2005 offer. *Id.* Ripplewood also met with Maytag's Board of Directors on many occasions between September 2004 and March 2005 for purposes of negotiating a buy-out. *Id.*

In its alleged efforts to obtain a higher price from Ripplewood, or to cause a bidding war, Plaintiff claims that Defendants intentionally ignored numerous internal reports circulated on February 9, 10, 22, and 25, 2005, advising that: 1) management forecasts had already been reduced to less than $1.00 per share for fiscal 2005; 2) Maytag had already missed its 2005 business plan forecast for January by 78%; and 3) management had difficulty accurately forecasting future performance and estimates and the forecasts were therefore unreliable. *Id.* ¶ 25. Plaintiff's Amended Complaint states:

> As Maytag has now acknowledged in its proxy statement issued in connection with the Ripplewood transaction, by February 2005, Maytag's board of directors had noted that the Company had a negative earnings momentum reflected in its stock price which was negatively impacting Ripplewood's offers for Maytag. Thus, it is clear that Maytag's management was deliberately, knowingly or recklessly delivering overstated projections for fiscal 2005 in order to inflate the price of Maytag stock in an effort to secure a higher price from Ripplewood and to attract greater interest from the community of potential suitors. The board has also acknowledged that Maytag's management had difficulty accurately forecasting its future performance, demonstrating an internal lack of confidence in its forecasting, yet the defendant nevertheless falsely expressed confidence in such forecasting and expressly "reaffirmed" its publicly disseminated financial and earnings forecasts.

*Id.* In addition to its alleged efforts to manipulate the stock price for purposes of a corporate merger or buy-out, Plaintiff claims that as of April 2005, "defendant Hake beneficially owned 533,436 shares of Maytag common stock and had stock-based holdings of 789,438 shares; defendant Moore beneficially owned 24,420 shares and had stock-based holdings of 88,187 shares." *Id.* ¶ 27. Thus, according to Plaintiff, Defendants knew and ignored, or were reckless in not knowing that the particularized earnings guidance disseminated to the investing public between March 7 and April 21, 2005, was materially false and misleading. *Id.* ¶ 28. Moreover, Plaintiff claims that no meaningful cautionary statements applied to the purportedly forward-looking statements such that the "Safe Harbor" provision of the Private Securities Litigation Reform Act (the "PSLRA") should apply. *Id.* ¶ 29.

## II. MOTION TO DISMISS

### A. *Rule 12(b)(6)*

In addressing a motion to dismiss under Rule 12(b)(6), this Court "is constrained by a stringent standard.... A complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 545–46 (8th Cir.1997) (quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir.1982) (citation omitted) (emphasis added)). In addition, the complaint must be liberally construed in the light most favorable to the plaintiff and should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *See Parnes*, 122 F.3d at 546. Finally, when considering a motion to dismiss for failure to state a claim, a court must accept the facts alleged in the complaint as true. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The Supreme Court has articulated the test as follows:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). A motion to dismiss should be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995).

### B. *15 U.S.C. § 78u–4*

In 1995, Congress enacted the PSLRA to remedy perceived abuses in securities class action litigation. The PSLRA, amongst other things, provides stringent standards regarding pleadings in private securities fraud actions. Specifically, the PSLRA, § 78u–4(b) provides:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

 (A) made an untrue statement of a material fact; or

 (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

(3) Motion to dismiss; stay of discovery

(A) Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u–4(b)(1–3).

Defendants argue that Plaintiff has failed to state an Exchange Act § 10(b) claim under Rule 12(b)(6), because Plaintiff has failed to allege specific facts giving rise to a strong inference of actual knowledge that the challenged earnings forecast was false when made, within the meaning of § 78u–4(b)(2). Defendants also urge that the Plaintiff's claims are foreclosed by the "Safe Harbor" provision for forward-looking statements under the PSLRA, § 78u–5, as well as by the "bespeaks caution" doctrine. Additionally, Defendants argue that Plaintiff's claim against Hake and Moore under § 20(a) of the Exchange Act are barred in light of Plaintiff's failure to state a § 10(b) claim.

## III. LAW AND ANALYSIS

A. *Failure to State with Particularity Facts Giving Rise to a Strong Inference that Defendants Acted with the Required State of Mind*

Section 10(b) of the Exchange Act provides that it is unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC under § 10(b), prohibits fraudulent conduct in the sale and purchase of securities. *See* 17 C.F.R. § 240.10b–5 (providing that it is unlawful for "any person, directly or indirectly ... (a) To employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.").

In 1976, the United States Supreme Court held that negligence is insufficient for civil liability under the Exchange Act, concluding that scienter, specifically "a mental state embracing intent to deceive, manipulate or defraud," is required. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also Fla. State Bd. of Administration v. Green Tree*, 270 F.3d 645, 653 (8th Cir.2001) ("Although not explicitly mentioned in the text of the rule, scienter is nevertheless an essential element of a Rule 10b–5 claim.").

The PSLRA enhanced the pleading requirement regarding scienter by "effectively mandat[ing] a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable.... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Fla. State Bd.*, 270 F.3d at 660 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195–96 (1 st Cir.1999)). Through the PSLRA, Congress enacted two heightened pleading requirements for cases alleging securities fraud:

The first requires that the complaint specify each false statement or misleading omission and explain why the omission was misleading. 15 U.S.C. § 78u–4(b)(1). The second requires that the complaint state 'with particularity' facts

giving rise to a "strong inference" that the Defendant acted with the scienter required for the cause of action. 15 U.S.C. § 78u–4(b)(2).

*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741–42 (8th Cir.2002) (quoting *Fla. State Bd.*, 270 F.3d at 654). Thus, in evaluating whether a complaint is sufficient under the stringent pleading standards of the PSLRA, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Id.* (quoting *Fla. State Bd.*, 270 F.3d at 660). Moreover, where, as here, the statements alleged to be misleading are forward-looking,[1] the PSLRA requires that the Plaintiff allege sufficient facts to show that the statement was made with "actual knowledge by [the person making the statement] that the statement was false or misleading; or if made by a business entity ... was ... made by or with the approval of an executive officer of that entity; and made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(A)–(B).

In support of their Motion to Dismiss, Defendants first contend that Plaintiff's claims must be dismissed because the Amended Complaint fails to state with particularity facts giving rise to a strong inference that Defendants had actual knowledge that the earnings projections were false or misleading. Plaintiff's resistance urges that, on March 7, 2005, when Maytag issued a press release "reaffirming" its earnings "guidance," and stating: "Maytag executives reaffirmed plans to achieve im-

proved earnings in 2005, expected by the company to be in the range of $1.10 to $1.30 per share, including about 5 cents of restructuring charges," Maytag was well aware that the earnings projections were completely unreliable. Indeed, Plaintiff points out, on April 21, 2005, Maytag cut its projected earnings forecast to between $0.45 and $0.55 per share, causing stock prices to drop from $15.10 per share to $10.89 per share after the announcement.

Plaintiff proffers several allegations in support of his conclusion that he has adequately alleged facts sufficient to demonstrate that Defendants knew or were reckless in not knowing their March earnings guidance and roadshow contained false or misleading earnings estimates. First, Plaintiff argues that in February 2005, the Board of Directors of Maytag commented on management's inability to accurately forecast, calling into doubt the reliability of the financial forecasting function at Maytag. Second, Plaintiff claims that by the time of the February 2005 Board of Directors meeting, Hake had acknowledged that "the company had failed to achieve its January earnings forecast and would likely fail to achieve its February forecast." Regarding this failure, Plaintiff states that Maytag knew, but concealed, the fact that its business forecast for January 2005 was off by 78%. Third, Plaintiff claims that internal reports circulated at the February 2005 meeting showed that internal management forecasts had been reduced to amounts well below those circulated to the public in March 2005. Finally, Plaintiff urges that ongoing negotiations with Rip-

---

1. In their briefs, the parties do not dispute that the allegedly false or misleading statements of Defendants are forward-looking statements, subject to the "actual knowledge" requirement. Indeed, the PSLRA specifically classifies "a statement of future economic performance, including any such statement contained in a discussion and analysis of fi-

nancial condition by the management or in the results of operations" as a forward-looking statement. *See* 15 U.S.C. § 78u–5(I). At oral argument, however, Plaintiff for the first time contended that Defendants' statements are not forward-looking. This issue will be discussed in the Court's analysis of the "Safe Harbor" provision, *infra*.

plewood gave an additional incentive for Defendants to mislead the public in an effort to maintain a higher stock value, an important factor in Maytag attaining the best possible merger or buy-out offer. Correspondingly, Plaintiff claims that, because the negotiations involved a complete sale of Maytag, the individual defendants had ample motive to bolster the stock price, as each owned numerous shares in Maytag that would be sold if the transaction with Ripplewood took place.

■ "Generally, the issue of whether a particular intent existed is a question of fact for the jury." *In re K-tel Intern., Inc. Sec. Litig.,* 300 F.3d 881, 894 (8th Cir. 2002). Nonetheless, in a § 10(b) case, "[s]ince 'conclusory allegations' do not satisfy the pleading requirements ... the complaint must provide a factual basis for allegations of scienter." *Id.* (citing *In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d at 40) (other citations omitted). In evaluating what is sufficient to satisfy the scienter pleading requirement, the Eighth Circuit Court of Appeals has stated the following:

> [W]e can say three things about motive and opportunity allegations. First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard. Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless. For instance, in insider trading cases, the timing of trades shows motive and opportunity, but it may also provide additional circumstantial evidence that the defendant knew of an advantage. Such allegations may meet the Reform Act standard, but if so it is because they give rise to a strong inference of scienter, not

merely because they establish motive and opportunity. Third, when the complaint does not show motive and opportunity of any sort-either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job— then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.

*Fla. State Bd.,* 270 F.3d at 660.

■ In keeping with the requirements of the PSLRA, then, while inferences must be drawn in favor of the non-moving party, "inferences of scienter do not survive if they are merely reasonable.... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Fla. State Bd.,* 270 F.3d at 660–61 (citing *Greebel,* 194 F.3d at 195–96 and *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) ("[T]he strong inference requirement means that plaintiffs are entitled only to the most plausible of competing inferences.")).

### 1. *Maytag's concerns over inaccurate forecasting.*

■ Plaintiff's first allegation that Defendants possessed the requisite level of scienter is that Defendants were aware that Maytag management "had difficulty accurately forecasting its future performance and such estimates and forecasts were therefore unreliable." Amended Compl. ¶ 25. The preliminary proxy statement filed by Maytag with the SEC states that on February 22, 2005, "the special committee discussed certain challenges facing the company, including the company's difficulty in accurately forecasting its future performance and adverse industry conditions, as well as the company successes, including recent additions to manage-

ment and cost reductions." Defs.' Ex. 12 at 20.

■ It is important to note that the PSLRA requires a showing that the Defendants knew or recklessly disregarded that their representations were misleading *at the time they were made*. "The mere fact that [a] forecast proved to be wrong in hindsight ... does not render the statement untrue when made." *Rubin v. Trimble*, 1997 WL 227956, at * 15 (N.D.Cal. April 28, 1997) (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir.1996)). While Plaintiff has alleged in the Amended Complaint that Maytag issued earnings forecasts knowing that it had a concern over its ability to accurately forecast earnings, this is insufficient, standing alone, to give rise to a strong inference of scienter. "Certainly, predictions 'are not exempt' from the securities laws ... but they are only actionable if the forecast might affect a 'reasonable investor' in contemplating the value of a corporation's stock." *Suna v. Bailey Corp.*, 107 F.3d 64, 70 (1st Cir. 1997) (finding forecasts not actionable where plaintiff failed to present facts demonstrating that the defendant had actual knowledge that the predictions were inaccurate at the time they were made) (quoting *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 211 (D.Mass.1993)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir.1997) (noting that forecasts do not contain an obligation by a company to disclose internal forecasts or even all material information, but rather "contain no more than the implicit representation that the forecasts were made reasonably and in good faith" at the time of their making).

While Plaintiff claims that Defendants hid their concerns from the public, notably an allegation that is not articulated in the Amended Complaint, Maytag's SEC filings clearly indicate that it had lowered its public earnings forecasts on more than one occasion in the past. *See* Pl.'s Resistance Br. at 2 (noting that Maytag's "own SEC filings make clear that through February 2005, the defendants were involved in a series of meetings in which their internal earnings estimates were subject to enormous criticism and constantly being revised downward."). It is implausible to conclude, given Maytag's history of adjusting downwards its earnings forecasts, that the public was somehow misinformed about the likely accuracy of the March 7, 2005 forecast.

*2. Internal forecasts were substantially lower than the public forecast.*

■ Plaintiff next contends that Maytag management was "circulating projections in the range of $1.10 to $1.30 per share, when they had internal projections that were already down to $0.97 per share." Pl.'s Resistance Br. at 11 (citing Amended Comp. ¶ 25, which alleges that at the time of the allegedly fraudulent earnings forecast, "management forecasts had already been reduced to well below the amounts circulated to public investors in March 2005"). Plaintiff's contention in this regard, however, is belied by Maytag's SEC preliminary proxy statement.

The proxy statement notes that "[o]n February 10, 2005, Maytag management reviewed with the board a 2005 earnings forecast *range* of $0.97 to $1.77 per share, based upon various assumptions, and certain changes to the earnings forecast resulting from, among other things, risks associated with pricing issues, higher costs and customer-related developments, as well as opportunities associated with pricing issues, cost savings, potential unit volume upside and currency rates from international operations." Defs.' Ex. 12 at 18 (emphasis added). The proxy statement also provides that at a February 25, 2005, board meeting, representatives from Lazard discussed three earnings per share

forecasts for fiscal year 2005: $1.15, $1.30, and $1.45. Each of these projections were prepared by Maytag management, "except for the $1.15 per share forecast." *Id.*

Plaintiff's assertion, then, that the March 7, 2005, earnings forecast was "well below" the publicly circulated amount is flatly contradicted by Maytag's SEC filings. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir.1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the Complaint."). Indeed, the range of $1.10 to $1.30 is below to the middle of those forecasts discussed at the February 25, 2005, board meeting, and well on the lower end of the range of figures discussed at the February 10 meeting. The mere allegation that management discussed *some* earnings forecasts lower than those actually publicly issued is unpersuasive to show scienter where, as here, the earnings forecast publicly issued was well within the *range* of numbers discussed by management in February 2005. Moreover, the allegation that some lower numbers were discussed does not amount to an allegation that Defendants did not reasonably believe that the $1.10 to $1.30 forecast was reasonable when made public in March 2005. "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd.*, 270 F.3d at 665 (8th Cir.2001). Nothing in Plaintiff's Amended Complaint attempts to discredit the methodology used to arrive at the internal management ranges discussed in February 2005, or otherwise indicates, or even implies that the methodology was unreasonable. *See In re Synovis Life Tech., Inc. Sec. Litig.*, 2005

WL 2063870, at *14–16 (D.Minn. Aug. 25, 2005) (finding no strong inference of intent where plaintiff alleged that defendants had "no basis" for their earnings projections where plaintiff failed to allege the methodology was false or misleading).

3. *Maytag missed its January 2005 forecast and expected to miss its February 2005 forecast.*

██ Plaintiff next asserts that scienter is demonstrated by the fact that Defendants knew they had missed their internal forecasts by 78% and were likely to miss their internal forecasts for February 2005. Maytag's preliminary proxy report notes that a decreased offering by Ripplewood was caused, in part, by "the failure to meet the 2005 '0 + 12' operating profit forecast by 78% for the month of January 2005." [2] Defs.' Ex. 12 at 19. The report also provides that at the February 25, 2005, meeting, representatives of Lazard noted "that the company failed to achieve the January earnings forecast and would likely fail to achieve the February forecast." *Id.* Defendants cite *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832 (S.D.Tex. Mar. 30, 2002) in support of the proposition that it is entirely plausible that Maytag could have missed its internal forecasts in the first two months of fiscal year 2005, and still perform well enough over the remaining ten months of the year to achieve its full year forecast of $1.10 to $1.30 per share. More specifically, Defendants argue that two bad months do not a bad year make.

In *Kurtzman*, between January 7, 1999 and April 9, 1999, Compaq made announcements that "presented a glowing picture" of its business prospects. *Id.* at *1. Specifically, the plaintiff in *Kurtzman* alleged that Compaq had falsely represent-

---

**2.** Plaintiff fails to note that the 78% miss referenced an aggressive internal earnings forecast of $1.77 per share, and not the lower earnings forecasts made publicly available.

ed that "business was booming, that demand for and sales of Compaq products were strong, that Compaq was successfully integrated with and enjoying synergies from its June 1998 acquisition of Digital Equipment Corporation ... and that it was in strong competition with Dell for direct sales to customers." *Id.* at *1–2. On April 9, 1999, after trading hours, "Compaq finally revealed to the market that its earnings expectations were vastly reduced to 15 cents per share." *Id.* at *2. The next day, the stock price for Compaq plummeted. *Id.*

The plaintiff alleged that Compaq knew that sales would not meet the projections for the year at the time it made positive statements, as Compaq knew as early as August 1998 that 1999 sales of Compaq personal computers were expected to decline across the board. *Id.* at *10. Moreover, the plaintiff alleged that Compaq executives participated in a meeting in February 1999 where it was revealed that Compaq's actual sales for the first six weeks of the fiscal year were well below expectations. *Id.* at *11.

The *Kurtzman* court dismissed the plaintiff's action on the basis that the plaintiff had failed to adequately allege facts giving rise to a strong inference of scienter. *Id.* at *13. The court specifically noted that the class period, January 9–April 9, 1999, was extremely brief, and the computer industry, for the past few years, had suffered extreme fluctuations in demand and sales. *Id.* The court found, in light of the short class period, that plaintiff's failure of allegations was fatal:

Plaintiffs have made no attempt to compare Compaq's situation with that of the industry as a whole at this time. Especially in light of the brevity of the Class Period designated here, moreover the Court finds that it is essential for Plaintiffs to allege particular facts and to provide specific time points of compari-

son that would demonstrate that the business problems experienced by Compaq from January 9–April 9, 1999 were not merely a short-term fluctuation but of considerable import and that Defendants were aware that the declines in demand and in sales in January 1999 were significant and material, i.e., that they indicated or determined the entire year's results. Plaintiffs need to prove factually and numerically specific information about the alleged decline in the Class Period and contrast it with conditions in parallel or equivalent quarters of past years or with past years as a whole, to establish by an objective means of measurement the significance as well as the particulars of the generally asserted downturn. The Court finds that they have completely failed to do so. Thus they fail to show that the claimed decline was significant in its impact in the short as well as in the long view.

*Id.*

Defendants also cite other federal cases, similar to *Kurtzman,* that they claim demonstrates that a company's failure to meet its projection for a short period does not show that a company knew that its full year projections were false when made. For example, in *Moss v. HealthCare Compare Corp.,* 75 F.3d 276, 282 (7th Cir.1996), HealthCare, "an independent provider of medical utilization review and preferred provider organization services," issued forward looking statements in early 1993 regarding revenues, earnings, and year-end revenues. *Id.* at 278. A March 30 press release indicated that "HealthCare was 'uncomfortable' with earlier analysts' estimates of year-end revenues and earnings...." *Id.* "The announcement in effect revised the prior ... comfort statements.... On the next trading day, HealthCare's stock declined ... more than 30 percent." *Id.* Plaintiff claimed that

HealthCare's positive public representations were made despite HeathCare possessing information demonstrating that it would not be able to meet the earnings projections. *Id.* at 279. The district court dismissed the plaintiff's claims of securities fraud, finding that the plaintiff had failed to adequately allege fraud by failing to show either: "(1) that the early February comfort statements lacked a reasonable basis, or (2) that a duty arose prior to the March 30 press release to correct the early February comfort statements." *Id.* at 281. The Seventh Circuit Court of Appeals affirmed, finding that the plaintiff's allegations that HealthCare knew enrollments were down for the period ending January 1, 1993 "does not show lack of a reasonable basis, primarily because it fails to demonstrate that HealthCare knew on February 2 and 9—the dates of the comfort statements—that total revenues for the year-end would be materially lower than analysts' projections." *Id.* at 282. Similarly, in *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), the defendant released information regarding its 2002 first quarter earnings, and its forecasts for anticipated performance in the second quarter of 2002. *Id.* at *1. The forecasts ultimately proved incorrect, and the plaintiff alleged that they were overstated and dishonest. *Id.* The district court dismissed the case, in part because the plaintiff's allegation that the defendant must have known that its projections for the second quarter were inaccurate due to sales being down at the end of the first quarter, amounted to "the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." *Id.* at *10 (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir.1999)). And in *Wallace v. Systems & Computer Tech. Corp.*, 1997 WL 602808 (E.D.Pa. Sept. 23, 1997), an allegation that defendants lacked a good faith belief in the truth of their forecast due to knowledge that certain por-

tions of their operations were performing poorly was rejected on the basis that it was "entirely possible that [defendants] and its officers expected revenues derived from other markets to make up for any increase in expenses resulting from difficulties" in other portions of the company. *Id.* at *18.

Plaintiff argues that Defendants' cited cases are inapposite, because "it is the defendants themselves who readily acknowledged in their devastating April 21 announcement that the failure to achieve the results in line with their estimates for the first three months had totally undermined their full year projections." Pl.'s Resistance Br. at 12. Specifically, Plaintiff is referring to Hake's statement to the Board of Directors on April 26, 2005, that "in his view, it would take two to three years for the Company to achieve an earnings turnaround." Defs.' Ex. 12 at 21. According to Plaintiff, this is "an enormous change of perspective in six weeks' time and it completely undermines any contention that the disastrous first two months of 2005 could be discounted or ignored as an aberration." Pl.'s Resistance Br. at 13. The Court must disagree.

In *In re Cerner Corp. Securities Litigation*, 425 F.3d 1079 (8th Cir.2005), the Defendant made favorable statements about its growth, the demand for its products, and its opinions on future earnings forecasts, specifically, that the demand for its products was "strong." *Id.* at 1082. Defendant eventually announced that it would not meet its revenue and earnings projections for the first quarter of 2003, causing its stock price to fall approximately forty-five percent. *Id.* The Eighth Circuit Court of Appeals affirmed the district court's dismissal of the case on the pleadings. Regarding the plaintiff's allegation that scienter was established by the fact that a former sales manager of the defen-

dant had stated that "he and some others discussed among themselves the unattainable nature of the earnings forecasts," the Court noted: "At best, this allegation establishes that such an opinion was held by the regional sales manager and his peers. It sheds no light on the relevant issue of whether the individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable." *Id.* at 1086.

Here, Hake's statements that a turnaround in revenues would take a substantial amount of time occurred well after the public statements of which Plaintiff complains. As in *Cerner,* Hake's statement reflects his own personal opinion that an earnings turnaround would take several years, not necessarily the opinion of either Maytag or Moore that such was the case. Moreover, Plaintiff has not offered any specific facts which could lead this Court to the conclusion that poor performance in the first two months made the achievement of the publicly announced earnings forecasts "necessarily unattainable." *Id.* Plaintiff has not alleged particular facts that could lead the Court to reasonably conclude that the failed performance by Maytag in January and February amounted to more than a short-term fluctuation. Plaintiff has offered no comparisons with Maytag's past performance, nor any comparisons with competitor operations that would support such a conclusion. At best, Plaintiff has offered an opinion statement by Hake, made more than a month after the March earnings forecasts. This evidence shows, "at most, that [Defendants] relied on ... forecasts that turned out in hindsight, to be inaccurate." *In Re Symbol Techs. Class Action Litig.,* 950 F.Supp. 1237, 1246 (E.D.N.Y.1997). Such an allegation does nothing to show that Defendants knew or recklessly ignored, at the time the March 2005 earnings projections were made, that they were false or otherwise misleading.

### 4. *Ripplewood transaction.*

Plaintiff denies that, standing alone, these factors cannot, as a matter of law, give rise to an inference of scienter. Rather, Plaintiff claims that the "allegations may in fact be sufficient since the named defendants were seeking to dispose of all of their shares of Maytag stock." Pl.'s Resistance Br. at 9; *see* Amended Compl. ¶ 27 ("Defendant Hake beneficially owned 533,436 shares of Maytag common stock and had stock-based holdings of 789,438 shares.... Defendant Moore beneficially owned 24,420 shares and had stock based holdings of 88,187 shares. All of these shares were to be sold at the price being paid by Ripplewood."). Further, Plaintiff urges the Court to assess the totality of the circumstances, and view the facts alleged in the context of Plaintiff's claim that Defendants were motivated to falsify the March earnings forecast to increase Maytag stock value to garner a premium price in the Ripplewood buyout/merger. Specifically, Plaintiff's Amended Complaint contends: "By maintaining artificially inflated prices for Maytag's stock, defendants were attempting to manipulate and ensure a higher offer price in connection with the transforming transaction." Amended Compl. ¶ 27.

The Eighth Circuit Court of Appeals has observed: "The desire to make a company seem more profitable is a desire 'universally held among corporations and their executives,' and thus is insufficient to prove scienter as a matter of law." *Cerner,* 425 F.3d at 1085 (quoting *Fla. State Bd.,* 270 F.3d at 664); *see also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001) ("[T]he desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired. Such generalized desires do not establish scienter."). This is because it is simply "too implausible to suggest that [a

company could] hope[ ] a buyer would purchase the company without performing its own examination of [the company's] financial status." *Fla. State Bd.*, 270 F.3d at 664. "Furthermore, unless the complaint shows that the benefit to an individual defendant is unusual, a desire to increase executive compensation is also insufficient to prove scienter." *Id.* (citing *K–Tel*, 300 F.3d at 894–95).

In the present case, no "unusual benefit" is apparent. While Plaintiff points to the stock holdings of Moore and Hake, and emphasizes that each planned to sell (though by necessity) all their shares in the event of a buyout by Ripplewood, he makes no allegation whatsoever that either attempted to sell or otherwise dispose of their stock while the price was "artificially inflated." "This deficiency, along with the fact that none of the ... Individual Defendants are alleged to have traded any stock during the class period, 'decreases any inference of scienter.'" *Cerner*, 425 F.3d at 1085 (quoting *K–Tel*, 300 F.3d at 895–96).

Plaintiff is correct that the Court, in assessing whether Plaintiffs have sufficiently pled scienter, must consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir.2003); *Fla. State Bd.*, 270 F.3d at 660 (suggesting that allegations of scienter may be considered collectively). After reviewing all of Plaintiff's allegations, however, the Court is unconvinced that they individually or collectively amount to a strong inference of scienter. Essentially, Plaintiff's allegations state that Defendants had difficulty making accurate earnings projections, discussed earnings projections both above and below those actually issued, and suffered poor performance in the first two months of the fiscal year for which the earnings projections were made. Even viewed in light of Defendants' negotiations with Ripplewood, a transaction which, contrary to Plaintiff's assertions was not imminent (Plaintiff admits, and Maytag's preliminary proxy statement provides, that Maytag had opted to discontinue discussions with Ripplewood prior to the public announcements here at issue), the Court finds that Plaintiff has offered a weak collection of allegations that amount at most to fraud by hindsight. Nothing in Plaintiff's Amended Complaint gives rise to a *strong* inference that Defendant *actually knew* that its earnings projections of March 2005 lacked a reasonable basis. Indeed, none of Plaintiff's allegations in any way posit that information used by Defendants in reaching its publicly announced projections was faulty. Moreover, Plaintiff's allegations, even when viewed in their totality, do not demonstrate "the likely prospect of [Defendants] achieving concrete benefits by the means alleged." *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001); *Helwig*, 251 F.3d at 548; *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir.1999) (finding the requisite intent exists only "[w]hen it is clear that a scheme, viewed broadly, is necessarily going to injure"). This is insufficient to meet the pleading requirements of the PSLRA.

### B. *Safe Harbor*

In the PSLRA, Congress expressly limited liability for forward-looking statements. Title 15 U.S.C. 78u–5 provides in relevant part:

(c) Safe harbor

(1) In general

Except as provided in subsection (b) of this section, in any private action

arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

 (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

 (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

 (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

 (ii) if made by a business entity; was—

 (I) made by or with the approval of an executive officer of that entity; and

 (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements

In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of *section 78m(a)* of this title or *section 78o(d)* of this title, or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied—

(A) if the oral forward-looking statement is accompanied by a cautionary statement—

(i) that the particular oral statement is a forward-looking statement; and

(i) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if—

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (I) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

■■■ Defendant argues that all of its March 2005 projections contained meaningful cautionary language that identified factors that could cause actual results to differ from the forecasts, such that they should be exempted from liability under the PSLRA's Safe Harbor provision. Plaintiff, on the other hand, counters that the statements in question are "present tense" statements, rather than forward-looking to the extent they discuss "reaffirmation" of earnings "guidance," thus prohibiting the statements from benefitting from the Safe Harbor provision of the PSLRA. Hearing Tr. at 50. Plaintiff relies on *Schottenfeld Qualified Associates, L.P., v. Workstream, Inc.*, No. 05–cv–7092 (S.D.N.Y. May 3, 2006), in support of this proposition.

In *Schottenfeld,* individuals who purchased Workstream stock between January 14, 2005, and April 14, 2005, claimed that Defendants made false and misleading statements regarding the Company's $10 million revenue projection for the quarter ending February 28, 2005. Specifically, Workstream issued a statement on January 14, 2005, stating: "As we enter the February 2005 quarter, we have strong visibility into our quarterly revenue target of $10 million, positive cash flow from operations and positive EBITDA drive by the strength of our subscription and service revenues." The company's CEO then stated, "I am very pleased with the overall growth and the momentum in our business. The Company continues to perform well and we continue to strengthen our market leadership position as we continue to invest in our customers, products and employees." These statements were reiterated several times in the following months and were accompanied over that time by a substantial increase in stock price.

On April 14, 2005, Workstream released its quarterly earnings statements, which totaled only $6.87 million, rather than $10 million. The company's stock price immediately declined from $4.20 per share to $1.76 per share. The district court found that cautionary language accompanying the allegedly false statements could not provide Safe Harbor protection because the "allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *Id.* (citing *In re AOL Time Warner, Inc. Sec. & Erisa Litig.,* 381 F.Supp.2d 192, 221 (S.D.N.Y.2004)). The court specifically found that the CEO had referred to "overall growth and momentum" as an existing fact. Further, the CEO "emphasized the 'strength of our subscription and services revenues'—referring to the Company's historical relationship with repeat subscription-based customers—as the source of the Company's 'strong visibility (sic)' for a $10 million quarter." "These are statements of present fact—Workstream's repeat subscription-based revenue—that bolstered the perceived veracity of the January Announcement, and are therefore not protected."

The PSLRA defines a "forward-looking statement" as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i).

Here, the statements alleged to be false or misleading, that is, that Maytag "reaffirmed its business strategies and guidance" and that "Maytag executives reaf-

firmed plans to achieve improved earnings in 2005, expected by the company to be in the range of $1.10 to $1.30 per share," are clearly forward-looking statements under 78u–5(i)(A). Nowhere in Plaintiff's Amended Complaint or in his Resistance Brief does Plaintiff ever refer to these statements as anything other than "forward-looking statements." Indeed, the only characteristic of the allegedly false statements that could be deemed indicative of the present tense is the fact that the company "reaffirmed its business strategies and guidance." Plaintiff does not allege that the reaffirmation of business strategies and guidance was false, but rather objects to the actual forecast itself, clearly stated in a forward-looking manner, that the company was maintaining its plan "to achieve improved earnings" that were "expected to be in the range of $1.10 to $1.30 per share." Moreover, even if the allegedly false and misleading statements were based in part on present tense factors, numerous courts have rejected the notion that this removes a statement from possible protection under the Safe Harbor doctrine. *See e.g., Harris v. Ivax Corp.,* 182 F.3d 799, 806 (11th Cir.1999) ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences.") *Kurtzman,* 2000 WL 34292632, at *13 ("[C]ourts have repeatedly recognized that whether a statement is technically characterized grammatically as present or future according to tense employed by the speaker is not the criterion; instead, as the PSLRA expressly states, it depends on whether it is 'a statement containing a projection of revenues, income . . . or other financial items,' or even more generally, 'a statement of future economic performance.' "); *Hockey v. Medhekar,* 1997 WL 203704, *5 (N.D.Cal. Apr. 15, 1997) (where "forward-looking statements . . . are based on . . . statements dealing with past or present facts, . . . these non-predictive

statements are 'assumptions underlying or relating to' statements of future economic performance [and] fall under the [PSLRA's] definition of forward-looking statements").

Plaintiff also urges that the forward looking statements cannot be protected by the Safe Harbor provision because they were made with actual knowledge of their falsity. As discussed, *supra,* the Court has concluded that Plaintiff has not stated with particularity facts giving rise to a *strong* inference that Defendants either knew or recklessly disregarded the truth or falsity of the March 2005 earnings projections at the time they were made. Moreover, the Safe Harbor provision of the PSLRA does not require both that a statement be made with actual knowledge of its falsity *and* that the statement be accompanied by meaningful cautionary language to receive protection from liability. Rather, the statute is worded in the disjunctive, providing that forward-looking statements, whether written or oral, will not be subject to liability to the extent that: 1) the statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" *or* 2) the forward-looking statement is "immaterial"; *or* 3) where the plaintiff fails to prove that the forward-looking statement was made with the requisite intent. *See* 15 U.S.C. § 78u–5 (c)(1)(A)-(B). Thus, assuming that Defendants' allegedly false or misleading statements were accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," this alone would be sufficient to invoke the Safe Harbor provision of the PSLRA.

*See In re Broadcom Corp. Securities Litig.,* 2004 WL 3390052, at \* 1 (C.D.Cal. Nov. 23, 2004) (rejecting as dicta Ninth Circuit language indicating that the PSLRA does not grant safe harbor to knowingly false or misleading statements, even when accompanied by cautionary statements, and stating, " 'under the language of 15 U.S.C. § 78u–5, a defendant is insulated from liability if it satisfies either subsection (A) or subsection (B); either prong is sufficient for immunity.' ") (quoting *In re SeeBeyond Tech. Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1165 (C.D.Cal.2003) and citing the Conference Committee as stating: " 'The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.' " H.R. Conf. Rep. 95–2, at 44, *reprinted in* 1995 U.S.C.C.A.A.N. 164, 743 (Joint Explanatory Statement of the Committee of Conference)); *see also Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 371 (5th Cir.2004) ("The safe harbor has two independent prongs...."); *Greebel,* 194 F.3d at 201 (recognizing that the statute is disjunctive, providing "safe harbor" through "two alternative inlets"); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1130 (9th Cir.2004) (affirming summary judgment based on the safe harbor rule without considering whether the alleged forward-looking statement was made with knowledge of its falsity); *In re Gilat Satellite Networks, Ltd.,* 2005 WL 2277476, \*12 (E.D.N.Y. Sept. 19, 2005) ("Once a court determines that a forward-looking statement is accompanied by cautionary language sufficiently meaningful as to render it incapable of being reasonably relied upon, it is immaterial as a matter of law and the court

need not consider the defendants' state of mind."); *In re Noven Pharm., Inc. Sec. Litig.,* 238 F.Supp.2d 1315, 1321 (S.D.Fla.2002) (referring to prongs of the safe harbor provision, and finding that satisfaction of only one prong is sufficient to invoke immunity).

Here, Defendants argue that the March 7, 2005 press release, as well as the investor presentations on March 7, 9 and 10, clearly identified the earnings forecasts as forward-looking statements and were accompanied by meaningful cautionary language that identified important factors that could cause the actual results to differ materially from the projections. Specifically, Defendants argue that meaningful cautionary language was presented in the following manner:

1) The March 7 press release expressly qualified management's 2005 earnings forecasts by warning investors about "steel and fuel cost increases, which continue to pressure profitability," and stated that management expected "material costs to be an ongoing challenge in 2005." Defs.' Ex. 6.

2) The investor presentations on March 7, 9, and 10 expressly cautioned investors to "expect approximately $90 to $100 million of unfavorable commodity price economics" in 2005, primarily from steel and fuel-related price increases, and identified "Volatility in raw material pricing" and "Competitive pricing" as two of the main challenges facing the company in 2005. Defs.' Exs. 8–10 at 21, 29.

3) Both the press release and the investor presentations incorporated by reference the company's quarterly reports, which attributed the declining financial performance of the company in 2004 to "increased costs, primarily related to steel and energy related items," and warned investors that the

"cost and availability of raw materials," "the availability and cost of energy," and "price competition" "may cause ... actual results to differ materially from those described in the forward looking statements." Defs.' Ex. 4 at 16, 23–24.

4) Both the press release and the investor presentations incorporated by reference the 2004 Annual Report, which warned investors that Maytag's profitability in the first half of 2005 would be "adversely impacted by the significant steel cost increases that occurred in the second half of 2004," that "the outlook for future material costs remains uncertain," and that, while Maytag had "recently implemented several price increases to compensate for higher material costs," "the impact of these price increases is uncertain due to potential competitive reactions and the uncertainty of consumer acceptance." Defs.' Ex. 5. at 19.

Defs.' Br. at 28–29. Plaintiff counters that, in each of these instances, the "language falls short of the safe harbor requirements." Pl.'s Resistance Br. at 22. Plaintiff further notes, without any legal citation, "that much of [Defendants'] defense relies on purported warnings or disclaimers contained in Forms 10–Q and 10–K, as filed with the SEC and incorporated into Maytag's March press release and investor roadshow by reference. This incorporation by reference is improper." *Id.*

■■■ Congress has directed courts to consider all information and documents relevant to a determination of whether a defendant has given adequate warnings for Safe Harbor protection. The Safe Harbor provision of the PSLRA provides that "the court shall consider *any statement cited in the complaint* and any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u–5(e) (emphasis added).[3] Furthermore, with regard to oral forward-looking statements, the Safe Harbor provision explicitly provides that a written, identified, and "readily available document" may be incorporated by reference. 15 U.S.C. § 78u–5(c)(2)(B). Any document either "filed with the Commission or generally disseminated shall be deemed to be readily available." 15 U.S.C. § 78u–5(c)(3). While the Safe Harbor provision does not explicitly provide for incorporation by reference for written forward-looking statements, numerous courts have concluded that cautionary language is not required to be in the same document as the allegedly false or misrepresented statement. *See e.g., Miller v. Champion Enter. Inc.,* 346 F.3d 660, 677–78 (6th Cir. 2003) (letter alleged to contain false statements contained meaningful cautionary language when it referred to risk disclo-

---

**3.** Clearly, the investor conference presentations, and Maytag's press releases are cited in the Complaint, and thus proper for consideration. Moreover, the district court may take judicial notice of public records, such as Maytag's SEC filings, and may consider them on a motion to dismiss. *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 802–03 (8th Cir.2002); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1275–81 (11th Cir.1999) (approving practice of judicially noticing public disclosure documents filed with SEC). Likewise, the press releases and investor presentations in Defen-

dants' Appendix represent the type of information that was publically available to reasonable investors at the time Defendants made the allegedly false statements, and are properly considered as well. *See e.g., Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 617 (4th Cir.1999). Even were the documents in Defendants' Appendix improper for consideration on the Motion to Dismiss, Plaintiff's claim would fail solely on the lack of particularized facts giving rise to a *strong* inference that Defendants acted with actual knowledge.

sures in company's Form 10–K); *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1122 (10th Cir.1997) ("[W]hen actually faced with the issue, courts have not required cautionary language to be in the same document as the alleged misstatement or omission."); *Employers Teamsters Local Nos. 175 and 505 Pension,* 353 F.3d at 1132–33 (finding meaningful cautionary language accompanied oral forward-looking statements where, during a conference call, the company referred potential investors to its Form 10K filed the previous September); *In re PEC Solutions Sec. Litig.,* 2004 WL 1854202, at *10 (E.D.Va. 2004) (forward-looking statements in press release protected by safe harbor where press release incorporated by reference the company's 2002 Form 10–K); *Stavros v. Exelon Corp.,* 266 F.Supp.2d 833, 844 (N.D.Ill.2003) (finding safe harbor applicable where "the documents containing the projections at issue specifically reference other factors listed in ... filings with the SEC"); *In re Humphrey Hospitality Trust, Inc. Sec. Litig.,* 219 F.Supp.2d 675, 684 (D.Md.2002) (finding safe harbor protections applied where press release referenced cautionary factors listed in company's SEC filings). Accordingly, the Court finds nothing improper about Defendants' citations and incorporations by reference.

 As discussed above, the statements here at issue fall under the first prong of the Safe Harbor if they were either accompanied by meaningful cautionary language or if they were immaterial. Language is meaningful and cautionary if it puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris,* 182 F.3d at 807 (affirming dismissal under PSLRA's safe harbor where forward-looking statements were accompanied by warnings that informed the reader in detail about the kinds of misfortunes that could befall the company and their potential ef-

fects). A company need not list all factors that might affect results. *Helwig,* 251 F.3d at 558–59 (citing H.R. Conf. R. No. 104–369, at 43 (1995), U.S.Code Cong. & Admin. News at 742). Indeed, the language need not explicitly refer to the risk that ultimately causes the projection to differ from the actual results, so long as the language actually used warned of risks "of a significance similar to that actually realized." *Harris,* 182 F.3d at 807. Nonetheless, the warnings must be more than boilerplate and should "convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *Helwig,* 251 F.3d at 558–59. Language is not sufficiently meaningful or cautionary if it merely warns of general risks applicable to any business, rather, it must be specifically tailored to the company's business. *See Champion,* 144 F.Supp.2d at 859. In the press release issued on March 7, 2005, Maytag "reaffirmed plans to achieve improved earnings in 2005, expected by the company to be in the range of $1.10 to $1.30 per share, including about 5 cents restructuring charges." Defs.' Ex. 6. Moore told investors that "aggressive cost-saving initiatives and appliance pricing are expected to offset steel and fuel cost increases, which continue to pressure profitability." *Id.* Moore stated that he "expects material costs to be an on-going challenge in 2005." The press-release was accompanied by the following language:

Forward–Looking Statements: Certain statements in this news release, including any discussion of management expectations for future periods, constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other

factors that may cause actual results to differ materially from the future results expressed or implied by those statements. For a description of such factors, refer to "Forward Looking Statements" in the Management's Discussion and Analysis section of Maytag's Annual Report on Form 10–K for the year ended January 1, 2005, and each quarter's 10–Q.

Defs.' Ex. 6. Maytag's presentation on March 7, 2005, at the James Investors Conference, its presentation on March 9, 2005, at the Smith Barney Conference, and its presentation at the March 10, 2005, Morgan Conference, contained identical provisions, substituting the word "document" for "news release." Defs.' Exs. 8–10. At each of the conferences, it was also announced that the Company "[e]xpect[ed] approximately $90–$100 million of unfavorable commodity price economics" related to "2004 Steel price carryover," "Tier II increases (primarily steel related)," and "Petroleum based (resins)." Defs.' Ex. 8–10 at 21. Each also discussed "2005 Risks and Opportunities," including challenges such as "Volume growth," "Competitive pricing," "Volatility in raw material pricing," and "Higher pension and postretirement expenses." *Id.* at 29.

The Form 10–K, for the year ended January 1, 2005, provides:

Market Risks

Our business is exposed to foreign currency exchange risk related to transactions, assets, and liabilities denominated in foreign currencies. . . .

We are exposed to commodity price risk related to our purchase of selected commodities used in the manufacturing of our products. We have entered into commodity swap agreements to reduce the effect of changing raw material prices for selected commodities including natural gas. At January 1, 2005, a uniform 10 percent increase in the price

of commodities covered by commodity swap agreements would have an insignificant effect on the fair market value of these commodity swap agreements. For all commodities, a uniform 10 percent increase in the price of future purchases of commodities would have a material impact on operations results. Our largest exposure is for steel prices, which have increased significantly in 2004. Our commodity swap agreements do not provide any hedge for increases in steel prices.

Interest rate risk for debt securities also poses a risk to our Company. . . . At January 1, 2005, an increase in interest rates of 1 percent would result in a decrease in net income of approximately $3 million for the year ending December 31, 2005.

Defs.' Ex. 5 at 14. The Form 10–K also provides the following provision entitled Forward Looking Statements and Business Risks:

This Management's Discussion and Analysis of Financial Condition and Results of Operation contains statements that are not historical facts and are considered "forward-looking". . . . We or our representative may also make similar forward-looking statements from time to time orally or in writing. The reader is cautioned that these forward-looking statements are subject to a number of risks, uncertainties, or other factors that may cause (and in some cases have caused) actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to the following

* Business conditions in the industries in which Maytag competes, including changes in economic conditions in the geographic areas where its operations are located or where products are sold

* Timing, start-up and customer acceptance of newly designed products

* Shortages of manufacturing capacity

* Competitive factors, such as price competition and new product introduction or the introduction of new competitors in existing customers, such as the announcement of an additional competitor selling to one of our largest customers, Home Depot

* Significant loss of business, such as the recent announcement that major appliances will not be sold at Best Buy effective in the first quarter of 2005, or inability to collect accounts receivable from a major national retailer

* The cost and availability of raw materials and purchased components, including the impact of tariffs

* The timing and progress of activities initiated to achieve further cost reductions and savings

* Financial viability of customers, suppliers, contractors, or insurers

* Union labor relationships

* The impact of business acquisitions of dispositions

* Increasing pension and post retirement health care costs due to changes in interest rates, the market value of assets held in trust to pay these obligations, or inflationary health care trend rates

* Costs of complying with government regulations

* Matters pending before the Consumer Product Safety Commission, including a previously announced recall of cooking products and an inquiry concerning a floor care product

* A failure to comply with the covenants in our credit agreement or any other event of default under the credit agreement, which would adversely impact our ability to borrow funds under the credit agreement or through the sale of commercial paper

* Litigation or regulatory investigations including product liability, environment remediation, taxes, and other claims or lawsuits

* Changes in the number of claims or the nature of those claims in the litigation related to front-load washers

* Product warranty claims

* Energy supply, including the availability and cost of energy necessary for the manufacturing process and the cost of fuel used in the distribution of products

* The impact of foreign currency exchange rate fluctuations

These factors may not constitute all factors that could cause actual results to differ materially from those discussed in any forward-looking statement. Our company operates in a continually changing business environment and new factors emerge from time to time. We cannot predict such factors nor can we assess the impact, if any, of such factors on our financial position or our results of operations. Accordingly, forward-looking statements should not be relied upon as a predictor of actual results. We disclaim any responsibility to update any forward-looking statement provided in this document.

Defs.' Ex. 5 at 14, 19–20. Maytag's Forms 10–Q (the latest dated October 21, 2004), referenced in each of the March 7, 9, and 10 presentations, as well as the March 7 press release, provides nearly identical language to that in the Form 10–K, notably that certain factors such as "increased costs, primarily related to steel and energy related items," "the cost and availability of raw materials," "the availability and cost of energy," and "price competition," "may cause actual results to differ materially

from those described in the forward-looking statements." Defs.' Ex. 4 at 16, 23–24.

Plaintiff argues that the March 7 press release does not actually contain any cautionary language because it simultaneously refers to aggressive cost savings that would offset rising steel prices. This, Plaintiff claims, "characterizes the seeming negatives as being addressed and accounted for in the process of reaffirming guidance." Pl.'s Resistance Br. at 23. However, the actual language of the press release was that "aggressive cost-saving initiatives and appliance pricing increases are *expected* to offset steel and fuel cost increases. . . ." Defs.' Ex. 6 (emphasis added). This language was immediately tempered by a statement that Moore "expects material costs to be an ongoing challenge in 2005." *Id.* Plaintiff's interpretation of these comments are unfounded and implausible when the comments are viewed in context. Maytag was clearly expressing its view that it had put in place measures which it "expected" to offset increased costs. Clearly those expectations did not materialize, but Plaintiff has not alleged *facts*, as opposed to speculation, which could lead the Court to the conclusion that those expectations were unreasonable *at the time they were made.*

Plaintiff does not dispute that Maytag's revision of its earnings projections on April 22, 2005, were due to "lower than-expected realization from [the Company's] pricing actions, as well as higher fuel and energy-related raw material costs," factors specifically listed in Maytag's forward-looking statement disclaimers. Defs.' Ex. 11. Nonetheless, Plaintiff argues that the allegedly "meaningful cautionary language" is neither meaningful nor cautionary because it did not account for "what Defendant knew by the time of the press release" and the investor conferences, namely that Maytag was already aware that the cautionary factors had already caused "the Company to underperform the same forecasts they were sharing with investors" and that the Company "had consistently failed to meet its earnings forecasts since 2003." Pl.'s Resistance Br. at 23–26.

The difficulty with Plaintiff's position, however, is that the earnings forecast was, at the time it was made, not solely for the first quarter of 2005, but for the entire year. As discussed *supra*, the mere fact that Maytag had suffered from poor performance in the first two months of the fiscal year does not support the conclusion that the earnings forecasts for the entire year were not reasonable at the time they were made. Nor does the fact that Maytag knew it had difficulty making accurate earnings forecasts (a fact that was also known to the public at large, as Maytag, by Plaintiff's own admission, had revised earnings projections in the past) give rise to the implication that the particular forecasts at issue were not grounded on a reasonable foundation.[4] Further, earnings forecasts and projections are inevitably inaccurate. It was precisely for this reason that Congress adopted the Safe Harbor provision of the PSLRA. *See Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir.1993) ("Predictions of future performance are inevitably inaccurate because things almost never go exactly as planned."); *Colby*, 817 F.Supp. at 211 ("[F]orecasts are

---

4. Plaintiff states that, "In order for Defendants to credibly claim that it was nothing more than incompetence which caused them to so grossly overstate their forecast, they should be able to point to some event occurring during March which dramatically impacted the Company's earnings. The fact is they cannot, because no such event occurred." Pl.'s Resistance Br. at 26. This statement misplaces the burden. It is Plaintiff, not Defendants, that must meet the pleading requirements under the PSLRA, as well as prove securities fraud should the case proceed to trial.

inherently difficult and unreliable, though necessary, and are not likely to be 'material' to investors. The [SEC] recognized this in adopting the 'Safe Harbor Rule.' ").

■ After reviewing the record as a whole, the Court finds that Defendants did issue "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" regarding the Company's 2005 earnings forecasts. In the press release and in each of the investor conferences, Maytag specifically identified steel, raw material and fuel pricing as sources of continuing concern, and also incorporated by reference the Company's Forms 10K and 10Q, which outlined the same concerns, as well as others.[5] In so doing, Maytag identified for the investing public risks that could, and ultimately did, cause the projections to differ materially from actual results. The warnings were not boilerplate. Rather they conveyed substantive information about concerns specific to Maytag's business. Plaintiff has not offered any *facts* from which the Court could legitimately infer that Defendants lacked a reasonable foundation for the projections at the time they were made. Accordingly, Defendants are entitled to the protections of the Safe Harbor rule of the PSLRA.

### C. *Bespeaks Caution Doctrine*

■ The judicially created "bespeaks caution" doctrine provides:

[W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*Parnes*, 122 F.3d at 548 (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir.1993)). "The cautionary language must relate directly to that by which plaintiffs claim to have been misled." *Id.* (internal quotation marks and citations omitted). "A dismissal of a securities fraud complaint under Rule 12(b)(6) should be granted under the bespeaks caution doctrine only where the documents containing defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." *Parnes*, 122 F.3d at 548 (internal quotation marks and citation omitted).

■ As the Court found in its discussion of the Safe Harbor provision, Defendants did issue meaningful cautionary statements identifying precisely those factors that ultimately led to Maytag lowering its earnings projections. As the public had cause to be aware, from previous SEC filings by Maytag, as well as by prior public announcements, Maytag had difficulty in making accurate earnings forecasts. Hence, even assuming that Maytag should have disclosed its doubts about its ability to accurately forecast, its failure to disclose did nothing to alter the "total mix" of information available to the public. "Because a reasonable investor would not

---

5. To the extent the Plaintiff argues that the 10K and 10Q cannot provide meaningful cautionary language because they are untimely, the Court disagrees. Prospective investors were specifically told to refer to those documents for a discussion of factors that could cause actual results to differ materially from the earnings projection. Moreover, while the 10Q was filed nearly six months before the public earnings forecasts, the 10K was filed a mere two weeks prior to the public earnings forecasts.

have ignored [the cautionary statements issued by Defendants and the other information about Maytag's forecasting ability], these alleged representations are immaterial as a matter of law" and must be dismissed under the bespeaks caution doctrine. *Parnes*, 122 F.3d at 549.

### D. *Plaintiff's § 20(a) Claims against Moore and Hake*

Having concluded that Plaintiff's § 10(b) claim fails to meet the pleading requirements of the PSLRA and are barred under the Safe Harbor rule and the bespeaks caution doctrine, Plaintiff's claims against Moore and Hake under § 20(a) cannot proceed. *See Navarre*, 299 F.3d at 748 (finding that an actionable § 20(a) claim must be preceded by an actionable primary violation under § 10(b)).

## IV. CONCLUSION

For the reasons stated herein, the Court finds that Plaintiff has not pleaded with particularity sufficient facts which give rise to a strong inference that Defendants actually knew that their public statements of March 2005 were false or misleading. Accordingly, Plaintiff's claim fails under the pleading requirements of the PSLRA, specifically § 78u–5(c)(1)(B). Moreover, the Court finds that Defendants' public announcements were accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in [their] forward-looking statements," within the meaning of § 78u–5(c)(1)(A), thus entitling Defendants to immunity from liability under the Safe Harbor provision of the PSLRA. Finally, the Court finds that Plaintiff's claims are barred by the "bespeaks caution" doctrine, as Defendants' public statements were accompanied by meaningful cautionary language such that they are immaterial as a matter of law.

For these reasons, Defendants' Motion to Dismiss (Clerk's No. 17) is GRANTED.

Plaintiff's Amended Complaint is dismissed with prejudice in light of the Court's conclusion that Defendants are immune from prosecution of Plaintiff's securities fraud claims under the Safe Harbor rule. *See Cerner*, 425 F.3d at 1083–86 (discussing review standards for district court's denial of leave to amend); *Harris*, 182 F.3d at 802–03 (same).

IT IS SO ORDERED