In re HEALTHCARE COMPARE CORP. SECURITIES LITIGATION.

Theodore MOSS, et al., Plaintiffs–Appellees,

v.

HEALTHCARE COMPARE CORPORATION, James C. Smith, and Joseph E. Whitters, Defendants–Appellants.

No. 95–2072.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1995.

Decided Jan. 24, 1996.

---

Michael J. Freed, Ellyn M. Lansing, Edith F. Canter, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Terry Rose Saunders, Chicago, IL, Edward A. Grossmann, Vincent R. Cappucci (argued), Patricia S. Gillane, Berstein, Litowitz, Berger & Grossmann, New York City, and Michael D. Craig, Schiffrin & Craig, Buffalo Grove, IL, for Plaintiffs–Appellees.

Lowell E. Sachnoff (argued), Gary S. Caplan, Joel S. Feldman, Christine Bodewes, Sachnoff & Weaver, Chicago, IL, and H. Nicholas Berberian and Robert J. Mandel, Neal, Gerber & Eisenberg, Chicago, IL, for Defendants–Appellants.

Before CUMMINGS, COFFEY and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

In this securities-fraud class action, plaintiffs, purchasers of HealthCare Compare Corporation's ("HealthCare") common stock, claim they were defrauded when a company press release expressing discomfort with analysts' high revenue and earnings estimates caused HealthCare's stock to decline more than 30 percent in one day. Plaintiffs claim that HealthCare knew the analysts' estimates were too high well before issuing the press release, and before making earlier public statements of comfort with the estimates. Plaintiffs' complaint survived a motion to dismiss in the district court, but we agreed to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and now reverse.

## I.

HealthCare is an independent provider of medical utilization review and preferred provider organization services. Medical utilization review is a system of monitoring the medical necessity and appropriateness of certain health care services prescribed for participants in health care and medical plans. In connection with preferred provider organizations, HealthCare is retained by payors of health care benefits and medical costs to design, structure, negotiate, and manage a network of medical providers and arrange for discounted health care costs with providers of health services. HealthCare's common stock is publicly traded on the NASDAQ market (National Association of Securities Dealers Automated Quotation System). Its revenues consist of fees for cost management services provided under contracts and fixed monthly charges for each participant in client-sponsored health care plans, excluding covered dependents.

The present controversy concerns three different forward-looking statements made by HealthCare early in 1993. The statements form the basis of plaintiffs' securities fraud claim. The first statements, made on February 2 and 9, were public statements of comfort with the range of analysts' estimates at the time for fiscal 1993 revenues and earnings, the earnings estimates ranging from $1.20 to $1.25 per share. The second statement consisted of field sales and year-end revenue estimates in a February 24 internal memorandum. The memorandum was compiled by Joseph Whitters, HealthCare's Chief Financial Officer, and was sent to Chief Executive Officer James Smith. The third statement was a March 30 press release indicating that HealthCare was "uncomfortable" with earlier analysts' estimates of year-end revenues and earnings that exceeded $160 million and $1.10 per share. The announcement in effect revised the prior February comfort statements of 40 percent growth down to a projected 30 percent growth rate for the calendar year. On the next trading day, HealthCare's stock declined $5⅝, closing at $12⅞—a drop of more than 30 percent. The first complaint was filed by plaintiffs within 24 hours.[1]

---

1. It is interesting to note that, according to defendants' brief, HealthCare's stock is currently trading for almost three times the closing price on March 31, 1993. (Def.Br. 3).

Plaintiffs assert that the positive public representations about HealthCare's business prospects for Fiscal 1993 prior to March 30 were made even though HealthCare had information demonstrating that it would not meet the $1.20–$1.25 earnings projections. They assert that HealthCare knew it would not meet earnings projections because of lower-than-expected insurance plan enrollments at year-end 1992. HealthCare's knowledge of adverse developments in the business was confirmed, plaintiffs argue, by the February 24 internal memorandum in which Whitters reported a revised revenue forecast. Specifically, the memorandum shows a reduction in 1993 revenues from $172,456,000 (estimated as of September 28, 1992) to $154,350,000 as of February 24, 1993. When HealthCare made its March 30 public announcement, the revised downward projection was attributed to a decrease in enrollments in previously announced contracts with The Federal Employees Health Benefit Plan (FEHBP) and other third-party contracts.

Plaintiffs filed a class action in district court alleging securities fraud against HealthCare and its officers, Whitters and Smith. The class consists of persons who purchased HealthCare's common stock from February 2, 1993 through and including March 30, 1993. Plaintiffs claimed that they were defrauded when the price of Health-Care's stock declined after the March 30 press release. Following the entry of a Pre-trial Order consolidating plaintiffs' individual actions, plaintiffs filed an Amended Consolidated Complaint. The district judge, upon defendants' motion, dismissed the complaint on June 1, 1994 for failure to meet the particularity requirement of Fed.R.Civ.P. 9(b) and for failure to state a claim under Securities Exchange Commission Rule 10b–5. Plaintiffs were given leave to file an amended complaint, which they did, for the first time incorporating allegations based on the February 24 internal memorandum. On February 13, 1995, the district court issued an order upholding the allegations pled in the Second Amended Complaint, and on March 10 Judge Plunkett certified the order for interlocutory appeal. We later granted defendants' petition for permission to appeal

the interlocutory order of February 13 pursuant to 28 U.S.C. § 1292(b).

## II.

■ Whether the district court correctly refused to dismiss the complaint is a question of law that we review *de novo*. Motions to dismiss that test the legal sufficiency of a complaint are granted when the plaintiff "can prove no set of facts" entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80. In reviewing a motion to dismiss, all facts alleged in the complaint and any inferences reasonably drawn therefrom must be viewed in the light most favorable to the plaintiff. *Caldwell v. City of Elwood,* 959 F.2d 670, 671 (7th Cir.1992).

### A.

We first address the jurisdictional issue raised by the dissent. Jurisdiction in this Court is premised on 28 U.S.C. § 1292(b), which gives a Court of Appeals discretionary authority to permit an appeal of an order not otherwise appealable if the district judge certifies the question. Judge Plunkett certified the question presented in this case for interlocutory appeal because he found the applicable legal standard in the Seventh Circuit was unclear, because the case before him presented a "close question," and because a "massive amount of discovery [is] lurking in this case" and there would be "meaningful discovery that would just be down the drain if I'm wrong." (Tr. of March 10, 1995, at 2–3). A motions panel of this Court, consisting of Chief Judge Posner and Judges Easterbrook and Manion, granted defendants' petition for permission to appeal the interlocutory order pursuant to Section 1292(b). Judge Ripple now dissents because he would not have entertained Section 1292(b) jurisdiction. In effect, Judge Ripple is dissenting not from this case, but from the decision of the motions panel. The dissent thus raises important issues regarding the prudence of revisiting the motions panel's decision.

■ The merits panel is certainly entitled to reexamine the decision of the motions panel, decisions that we have previously noted are "summary in character, made often on

a scanty record, and not entitled to the weight of a decision made after plenary submission." *Johnson v. Burken,* 930 F.2d 1202, 1205 (7th Cir.1991). But other factors counsel in favor of deferring to the motions panel. Once the motions panel grants the petition, the litigants are in essence told that this Court will exercise jurisdiction. As a result, district court proceedings are usually stayed and the parties undergo the time and expense of fully briefing and arguing their case on appeal. Were this Court to vacate the motions panel's decision, not only would the parties have suffered significant delay in the district court, but this Court would have wasted substantial resources in administering and hearing a full-blown appeal on the merits. As such, the purpose of Section 1292(b) to speed litigation and conserve judicial resources is utterly thwarted. See *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 474–475 & n. 25, 98 S.Ct. 2454, 2460–61, 2461 n. 25, 57 L.Ed.2d 351; see also *Johnson,* 930 F.2d at 1206 (agreeing to decide the merits of the case and speed the litigation "since it has been briefed and argued").

In addition, the applicable procedural rules indicate that a motions panel deciding a Section 1292(b) question might be better informed than the merits panel on the jurisdictional issue, or at least equally informed. The party seeking appellate jurisdiction is required to include in its petition "the facts necessary to an understanding of the controlling question of law ... and a statement of the reasons why a substantial basis exists for a difference of opinion on the question and why an immediate appeal may materially advance the termination of the litigation." Fed.R.App.P. 5. On the other hand, the parties are not required to address the standards of Section 1292(b) in their briefs to the merits panel, other than by way of a cursory statement of the jurisdictional basis. Fed. R.App.P. 28(a)(2), 28(b). Here the parties did not even brief the Section 1292(b) issue. We are confident that both the procedural rules and most litigants contemplate that the merits panel will defer to the Court's original decision on the petition for permission to appeal.

None of this is to suggest that cases do not exist in which reexamination is both appropriate and important. *Johnson* is one such case. In *Johnson,* the controlling issue certified by the district court involved the validity of a service of process. We agreed to hear the appeal, but a second and different form of process was served before the merits panel could make its determination on the first service. Thus an intervening event cast doubt on whether the certified question was "controlling" within the meaning of Section 1292(b), and the merits panel properly took a fresh look at the jurisdictional question. *Id.* at 1205–1206. Where the merits panel has reason to believe that the motions panel would choose to reconsider the petition in light of intervening circumstances or other defects in its ability to make a fully informed jurisdictional determination, it is appropriate for the merits panel to reexamine the Section 1292(b) issue. But where, as here, nothing indicates that this panel is better equipped to make the 1292(b) determination than was the motions panel, honoring the original jurisdictional decision is the more prudent course.

## B.

SEC Rule 10b–5, promulgated under Section 10(b) of the Securities Exchange Act of 1934, prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To state a valid Rule 10b–5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329 (7th Cir.1995). This case concerns plaintiffs' alleged failure to meet the third of these required allegations. HealthCare frames its argument that plaintiffs have not adequately pled fraud under both Fed.R.Civ.P. 9(b) and 12(b)(6). The arguments are inherently intertwined because pleading fraud with specificity is both an element of the SEC Rule 10b–5 cause of

action and a pleading requirement of the Federal Rules.

Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." Fed.R.Civ.P. 9(b). With respect to securities fraud cases, Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support: "the complaint ... must afford a basis for believing that plaintiffs could prove scienter." *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.1990), certiorari denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312. We have said that a sufficient level of factual support may be found where the circumstances are pled "in detail." *Id.* at 627. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.* In addition, cases involving forward-looking statements are unique. As we noted in *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993), "predictions of future performance are inevitably inaccurate because things almost never go exactly as planned," (citing *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509 (7th Cir.1989)). Thus companies making forward-looking statements are afforded a safe harbor: plaintiffs must allege "specific facts which illustrate that [the company's] predictions lacked a reasonable basis." *Arazie,* 2 F.3d at 1468; see also *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995); *Wielgos,* 892 F.2d at 513 ("Forward-looking statements need not be correct; it is enough that they have a reasonable basis."); *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1132 (7th Cir.1993) ("If those statements had a reasonable basis when made, the defendants did not commit fraud."), certiorari denied, —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78. Projections which turn out to be inaccurate are not fraudulent simply because subsequent events reveal that a different projection would have been more reasonable. *Grassi v. Information Resources, Inc.,* 63 F.3d 596, 599 (7th Cir.1995).

In dismissing plaintiffs' first complaint, the district court was primarily concerned that plaintiffs did not explain when or how HealthCare knew that client enrollments and new business revenue were below expected levels, or why HealthCare should have been able to process the information prior to March 30, 1993. In other words, to allege fraud adequately, plaintiffs needed to show either (1) that the early February comfort statements lacked a reasonable basis (presumably because HealthCare knew the analysts' estimates were too high), or (2) that a duty arose prior to the March 30 press release to correct the early February comfort statements—a duty the neglect of which amounts to fraud. We agree with the district court that plaintiffs must demonstrate either lack of a reasonable basis or neglect of a duty to correct amounting to fraud.

To show lack of a reasonable basis, plaintiffs point to several paragraphs in their Second Amended Complaint. They argue that the allegations establish that HealthCare knew or recklessly disregarded the fact that the revenue and earnings projections made public on and after February 2, 1993, were without any reasonable basis. The essential allegations in the complaint are paraphrased as follows:

(1) Due to its fixed contracts with clients, HealthCare was able to predict with certainty revenue and earnings levels for its fiscal year at the beginning of the calendar year; during the enrollment period ending January 1, 1993, HealthCare's clients (including FEHBP) failed to sign up as many employees as it had anticipated. (Complaint ¶¶ 44, 57, 58).

(2) HealthCare has an advanced database, giving it the ability to calculate yearly fees quickly upon being advised of enrollment levels; HealthCare was able to process enrollment data and translate it into certain financial forecasts at least by February 24, 1993. (Complaint ¶¶ 44, 60).

(3) Clients desire locking in fixed rates, so they typically advise HealthCare of the number of enrollments soon after the enrollment cutoff dates, which in most cases are just prior to the beginning of the calendar year. (Complaint ¶¶ 44, 57).

(4) The February 24, 1993, internal memorandum confirms that HealthCare knew analysts' earlier predictions were too high. (Complaint ¶ 59).

Plaintiffs have the burden of pleading sufficient facts to call the reasonable basis of HealthCare's early February comfort statements into question. *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992). The allegations listed above are insufficient. Plaintiffs' allegation that HealthCare's enrollments were down for the period ending January 1, 1993, does not show lack of a reasonable basis, primarily because it fails to demonstrate that HealthCare knew on February 2 and 9—the dates of the comfort statements—that total revenues for the year-end would be materially lower than analysts' projections. Plaintiffs' complaint even cites an industry portfolio letter that says HealthCare renews contracts twice a year—January 1 and July 1. Clearly January 1 enrollment is not the only factor that figures into HealthCare's revenues. Further, the allegation that HealthCare has an advanced database does little to show what the company knew in early February. Nowhere does HealthCare allege how the database was used in 1993, what information was processed, or any other specifics regarding use of the database prior to February 2 and 9.

Plaintiffs' inability to plead lack of a reasonable basis with specificity is further revealed by their other allegations. For example, plaintiffs allege that "defendants knew as early as February 24, 1993 that the Company's clients had experienced reduced enrollments." (Complaint ¶ 59). They then allege that the database enabled them to process enrollment data "at least by February 24, 1993." (Complaint ¶ 60). In pleading that the earlier comfort statements were made without a reasonable basis, it is insufficient to allege what plaintiffs knew as of February 24. For the same reason, the allegations regarding the February 24 internal memorandum (the primary addition to the Second Amended Complaint) are also insufficient to show lack of a reasonable basis for the February 2 and 9 statements. There is nothing in the complaint to link specifically what HealthCare knew in the internal memorandum to what it knew earlier in the month. The fact that the memorandum came out after the comfort statements rather than before suggests that HealthCare had not completed the internal estimates earlier in February. We cannot reasonably infer from these allegations that HealthCare's early February comfort statements lacked a reasonable basis.

The second question, then, is whether the February 24 internal memorandum or any other fact indicates that HealthCare had a duty to correct the comfort statements prior to March 30, 1993. Plaintiffs argue that HealthCare was required to correct the early February comfort statements immediately after generating the February 24 memorandum. Although HealthCare did revise the statements about five weeks later on March 30, plaintiffs claim that the company's failure to correct them earlier is actionable as securities fraud. Arguing that it had no duty to correct the statements earlier, HealthCare relies on *Stransky, supra,* where we specifically declined to adopt a bright-line rule that a duty to correct exists when a company makes a forward-looking statement that becomes untrue because of subsequent events. Reliance on *Stransky* is somewhat misplaced. There we declined to find a duty to correct based on the rationale that "just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true." 51 F.3d at 1332 (quoting *Pommer v. Medtest Corp.,* 961 F.2d 620, 623 (7th Cir.1992)). This is not a case where things unexpectedly went wrong; rather, plaintiffs allege that the circumstances which made the comfort statements false (lower enrollment, etc.) arose prior to the statements—even if only realized by HealthCare on February 24.

Thus we decline to hold that *Stransky* adopted a bright-line rule that no duty to correct exists in any case. Rather, we are persuaded that plaintiffs can only show that a duty to correct arose by alleging facts sufficient to demonstrate that the internal memorandum was certain and reliable, not merely a tentative estimate. Otherwise, it was not unreasonable for HealthCare to wait until March 30 to make a public announcement. We held in *Panter v. Marshall Field & Co.,* 646 F.2d 271, 291–293 (7th Cir.1981), certiorari denied, 454 U.S. 1092, 102 S.Ct.

658, 70 L.Ed.2d 631, that "firms need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading." *Wielgos,* 892 F.2d at 516; see also *Searls,* 64 F.3d at 1067 (holding that projections were tentative and were prepared for the benefit of management). As we further reasoned in *Wielgos,*

> Issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants.... Because firms may withhold even completed estimates, they may withhold in-house estimates that are in the process of consideration and revision. Any other position would mean that once the annual cycle of estimation begins, a firm must cease selling stock until it has resolved internal disputes and is ready with a new projection. Yet because large firms are eternally in the process of generating and revising estimates—they may have large staffs devoted to nothing else—a demand for revelation or delay would be equivalent to a bar on the use of projections if the firm wants to raise new capital.

*Id.* at 516; see also *Grassi,* 63 F.3d at 599; *Arazie,* 2 F.3d at 1468.

Plaintiffs have not met their burden to show that the internal memorandum did not merely contain tentative projections subject to revision. As plaintiffs' complaint alleges, the February 24 memorandum contained a revised revenue forecast for Fiscal 1993. Based on the complaint, the purpose of the memorandum was to compare internal forecasts made on September 28, 1992, with February 24, 1993, forecasts in five major segments of HealthCare's business. The memorandum showed a revised forecast of 1993 revenues, down from $172,456,000 in September 1992 to $154,350,000 in February 1993, and attributed the decline to a loss of revenues from two primary customers. (Complaint ¶ 59). The complaint fails to allege even a single fact relevant to the certainty or finality of these figures; nothing in the complaint belies the possibility that the figures reported in the memorandum were subject to revision or verification before they could be made public. Plaintiffs allege that "HealthCare routinely prepared on an annual basis a yearly revenue forecast in the second month of each fiscal year as it did in 1993." (Complaint ¶ 59). But the complaint fails to take the next essential step of alleging facts showing that the February 24 memorandum was a final version—rather than merely a preliminary draft—of this yearly revenue forecast. We are unable to find anything in the complaint from which we could draw even an inference that the memorandum was final and appropriate for public revelation.

■■■ We are further persuaded that plaintiffs failed to allege fraud by the lack of any sufficient allegations regarding fraudulent intent or motive.[2] Here sufficient allegations regarding motive, though not necessary to state a claim for securities fraud, would have allowed this Court to draw inferences favorable to plaintiffs regarding the disparity in projections in the various statements. The mere temporal proximity of the conflicting statements is not sufficient: "[T]emporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent." *Arazie,* 2 F.3d at 1467–1468. Thus we have stressed the importance of pleading motive in *DiLeo, supra,* where we concluded that the complaint failed to show what the company would gain from fraudulent activity:

> [T]he complaint offers no reason to infer that [the company] possessed the mental state necessary for a primary violation. Although Rule 9(b) does not require "particularity" with respect to the defendants' mental state, the complaint still must afford a basis for believing that plaintiffs could prove scienter.

> \*　　\*　　\*　　\*　　\*　　\*

People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One

---

2. Such allegations may be averred generally.

Fed.R.Civ.P. 9(b).

who believes that another has behaved irrationally has to make a strong case. 901 F.2d at 629. Plaintiffs' complaint fails to plead sufficient facts supporting a motive to make fraudulent statements. For example, plaintiffs do not allege insider trading during the class period, nor do plaintiffs allege that HealthCare desired to inflate its stock price due to an impending merger or acquisition. Only the following allegations relate to motive:

> The defendants [made fraudulent statements] to (a) perpetuate the appearance of HealthCare's sustained growth; (b) allow Smith and Whitters to retain their positions, compensation and other substantial perquisites of executive employment; (c) inflate analysts' projected estimates of HealthCare's revenues and earnings per share; and (d) perpetuate the inflated value of defendants' substantial personal holdings in Company securities.

(Complaint ¶ 15). The first and third of these allegations in Paragraph 15 are essentially the same, and neither relates to underlying motive beyond the simplistic assertion that "HealthCare said its company was more valuable than it was so people would believe HealthCare was more valuable than it was." The second allegation in Paragraph 15 also fails to support an underlying motive, as plaintiffs offer no facts to support the necessary inference that the defendant officers were in danger of losing their positions based on a revised earnings estimate for the fiscal year. As to the fourth, plaintiffs are just short of alleging insider trading; however, nowhere do plaintiffs allege that defendants sold or intended to sell stock during the class period.[3] Thus plaintiffs have failed to provide this Court with any additional reason to draw inferences of fraud from their complaint.

### III.

Stating a claim for securities fraud requires more specific allegations regarding fraud than plaintiffs' complaint provides. The February 24 memorandum is obviously the crux of this case, because it is the primary allegation intended to show either that HealthCare made its early February comfort statements without a reasonable basis or that HealthCare fraudulently failed to correct the comfort statements earlier than March 30, 1993. We conclude that neither the February 24 memorandum nor any other allegation states a claim for securities fraud. Plaintiffs have failed to allege facts showing that the comfort statements were made without any reasonable basis and have failed to allege facts from which this Court could infer that the February 24 memorandum was anything other than a tentative internal estimate subject to revision. Therefore the district court's order is reversed and remanded for dismissal of the Second Amended Complaint.

RIPPLE, Circuit Judge, dissenting.

The requirement that fraud be pleaded with specificity has many salutary justifications. It safeguards defendants from baseless charges of moral turpitude and makes it more difficult to bring such allegations solely because of their nuisance or settlement value. It affords the defendant sufficient information to permit an intelligent evaluation of the complaint and a focused response. See 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1296. In my

---

**3.** Plaintiffs also point to Paragraph 40 of the complaint as alleging motive. There plaintiffs state that throughout November and December 1992 company insiders sold stock to the public at prices averaging over $30 per share, leading the investing public to believe that the Company would continue to report record revenue and earnings growth. (Complaint ¶ 40). In their brief, plaintiffs state that the subsequent fraudulent statements were made to distance HealthCare from and avoid suspicion of insider trading prior to the class period. We fail to see how this allegation supports a motive to defraud investors. First, plaintiffs do not allege that the November/December 1992 stock activity was signifi-

cantly greater than at other times. Second, plaintiffs do not allege that HealthCare knew in November and December of 1992 that the stock value would decline in 1993. Thus without these two additional allegations, it is not at all clear how the November/December activity could constitute insider trading and even less clear why HealthCare would be motivated to defraud investors in order to avoid suspicion of insider trading.

Plaintiffs also point to Paragraph 65 of the complaint as alleging motive. However, Paragraph 65 does nothing more than repeat the allegations contained in Paragraphs 15 and 40.

view, the district court's decision demonstrates that these concerns are safeguarded adequately in the present case and that litigation beyond the pleading stage is appropriate. Our earlier case law sets forth, as adequately as they can be stated, the applicable standards in this area. Reasonable minds can—and will—differ on the adequacy of the factual specificity in an allegation of fraud. The issue is, by its nature, case specific and neither the case law of this circuit nor the case law of the other circuits can make any claim to being a seamless garment.

In addition to noting my respectful disagreement on the merits, I also write to suggest that, as a prudential matter, this court ought to exercise significantly more restraint in using the certification procedure to review fact-bound issues with respect to the adequacy of a complaint. I hope that the court's action in this case does not signal a radical change in its receptivity to such overtures. Before embarking on such a course, we ought to reflect on the significant institutional costs implicated in such an approach. Certification is not a vehicle for obtaining a "second opinion" on every fact-bound issue that confronts a district court. The Supreme Court has made it clear that "even if the district judge certifies the order under § 1292(b), the appellant still 'has the burden of persuading the court of appeals that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978) (quoting *Fisons, Ltd. v. United States,* 458 F.2d 1241, 1248 (7th Cir.1972)). This principle has been confirmed just recently by the Court of Appeals for the Second Circuit in *In re Prudential Lines, Inc.,* 59 F.3d 327, 332 (2d Cir.1995).

Absent the most unusual circumstances,[1] I do not believe that the certification procedure of 28 U.S.C. § 1292(b) ought to be employed as a device to allow interlocutory review of close, fact-bound judgment calls by district courts concerning the adequacy of a complaint. Here, the district court had be-

fore it a decision that confronts district courts every day—the sufficiency of a complaint's factual allegations. The district court made a determination that the allegations were sufficient. Although my colleagues disagree with that judgment call, they point to no issue of law, no significant doctrinal development that compels departure from the normal course of adjudication.

The specificity requirement of Rule 9(b) does not come without its costs. Wright & Miller § 1296. The requirement creates significant delays by encouraging a great deal of motion practice. *Id.* If, in addition to this motion practice, we now invite defendants in fraud cases to litigate the factual specificity of the complaint not only in the district court but also in this court, much of the benefit of Rule 9(b) certainly will be diluted. Indeed, if we allow fraud complaints to visit this court as a matter of course after an unsuccessful motion to dismiss based on factual insufficiency, we shall be hard-pressed to turn away other fact-based denials of a motion to dismiss the complaint for failure to state a cause of action. The tactical weapon of delay will have found another battlefield. Appellate resources can be put to better use.

---

1. In this respect, the court ought to weigh the burden on the parties, financial and otherwise, as well as the overall burden on judicial resources. Although the district court noted, in conclusory fashion, that, absent certification, the parties would engage in a significant amount of discovery, it made no finding that the extent of that discovery would be unusual.