## In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1014

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

KEVIN HENDERSON,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 04 CR 697—**Robert W. Gettleman**, *Judge.*

_____

ARGUED OCTOBER 30, 2007—DECIDED AUGUST 6, 2008

_____

Before MANION, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Police were called to the home of
Patricia and Kevin Henderson on the southwest side of
Chicago to investigate a report of domestic abuse. At the
scene officers met Patricia Henderson standing on the
front lawn; she told them her husband, Kevin, had choked
her and thrown her out of the house. She also warned that
Kevin had weapons in the house and had a history of
drug and gun arrests. Using a key provided by the
Hendersons' teenage son, officers entered the home and
encountered Kevin Henderson inside. In unequivocal

terms, he ordered them out. The officers then arrested Henderson for domestic battery and took him to jail.

After Henderson's arrest and removal from the scene, Patricia signed a consent-to-search form and led the police on a search that uncovered several firearms, crack cocaine, and items indicative of drug dealing. Henderson was indicted on federal weapon and drug charges. He moved to suppress the evidence recovered from his home, arguing the search was unreasonable under the Fourth Amendment based on the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006). The district court agreed, holding that Henderson's prior objection trumped Patricia's subsequent consent even though he was no longer present and objecting when she consented. The government now appeals the court's suppression order.

We reverse. *Randolph* left the bulk of third-party consent law in place; its holding applies only when the defendant is both present and objects to the search of his home. Although Henderson was initially at home and objected to the presence of the police when they arrived, his objection lost its force when he was validly arrested and taken to jail for domestic battery. At that point Patricia was free to consent to a search notwithstanding Henderson's prior objection; we do not read *Randolph* as permanently disabling her shared authority to consent to an evidentiary search of her home. Patricia's subsequent consent, freely given when Henderson was no longer present and objecting, rendered the warrantless search of their home reasonable and valid as to him.

## I. Background

On a late November morning in 2003, Chicago police officers responded to a report of domestic abuse at the home of Patricia and Kevin Henderson on the southwest side of the city. At the scene officers found Patricia standing with a neighbor on the front lawn of her home. She told the officers that Henderson had choked her and then threw her out of the house after learning she had called 911. Patricia had noticeable red marks around her neck that substantiated her story.

The Hendersons' teenage son arrived shortly after the police and gave them a key to the home. Before the police entered, Patricia told them that Henderson had weapons in the house and had a history of drug and gun arrests. Patricia said she was willing to file a complaint against Henderson and wanted him arrested. The parties dispute whether or not Patricia also told the officers, prior to their entering the house, that she wanted the house searched.

The police used the key to enter the house and found Henderson in the living room. After a brief exchange, Henderson told the officers to "[g]et the [expletive] out of my house"—which the district court reasonably construed as an objection to a search. Henderson was then arrested for domestic battery and taken to the police station. Patricia was still outside and did not observe Henderson's encounter with the police. A few minutes after Henderson was taken to the station, Patricia agreed to a search of the home and signed a consent form.

Patricia led the officers to the attic where they discovered crack cocaine and drug-dealing paraphernalia, four handguns, a shotgun, a rifle, a machine gun, and live

rounds of ammunition. In the basement they found a machete, a crossbow, and more ammunition, as well as an M-1000 explosive device. Patricia suggested that the officers also search the family car, and she signed another consent form. This search uncovered additional crack cocaine.

Henderson was charged with possession of crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), various firearms-related offenses in violation of 18 U.S.C. §§ 922 and 924, and possession of an explosive device in violation of 26 U.S.C. § 5861(d). Henderson moved to suppress the evidence obtained from the search of the house and car, arguing that the Supreme Court's decision in *Randolph* required suppression because he was a present and objecting resident whose express refusal to allow a search overrode Patricia's later consent. The district court agreed as to the search of the house and suppressed the evidence recovered in that search. The government appealed.[1]

## II. Analysis

### A. Appellate Jurisdiction

Henderson moved to dismiss the government's appeal for lack of appellate jurisdiction. In a criminal case, the United States may appeal "a decision or order of a district court suppressing or excluding evidence" so long as the appeal is "taken within thirty days after the decision,

---

[1] Henderson cross-appealed the district court's refusal to suppress the crack cocaine recovered from the car. He has since voluntarily dismissed the cross-appeal.

judgment or order has been rendered." 18 U.S.C. § 3731. The district court announced its decision orally on June 26, 2006, and the government did not file this appeal until December 29. It did, however, move the district court to reconsider its order on July 21, within the 30-day period, and then filed its notice of appeal within 30 days of the district court's denial of the motion to reconsider.

After both parties filed briefs addressing appellate jurisdiction, a motions panel of this court denied the motion to dismiss. Decisions by motions panels do not "resolve definitively the question of our jurisdiction, and we are free to re-examine" the question when the merits panel hears the case. *United States v. Lilly*, 206 F.3d 756, 760 (7th Cir. 2000). Often a motions panel must decide an issue "on a scanty record," and its ruling is "not entitled to the weight of a decision made after plenary submission." *Johnson v. Burken*, 930 F.2d 1202, 1205 (7th Cir. 1991). Nevertheless, when the merits panel is no better equipped to make a decision than the motions panel— particularly regarding questions of appellate jurisdiction— "honoring the original jurisdictional decision is the more prudent course." *Moss v. Healthcare Compare Corp.*, 75 F.3d 276, 280 (7th Cir. 1996).

Both parties were given the opportunity to fully brief the jurisdictional issue before the motions panel, and under the circumstances here, we are no better situated than the motions panel to decide the issue of appellate jurisdiction. In any event, the decision of the motions panel was manifestly correct; the Supreme Court's decision in *United States v. Healy* squarely controls the question. 376 U.S. 75, 78 (1964) (holding that "criminal judgments are nonfinal for purposes of appeal so long as timely rehearing petitions are pending"); *see also United States v. Ibarra*,

502 U.S. 1, 6-8 (1991) (per curiam); *United States v. Dieter*, 429 U.S. 6, 7-8 (1976) (per curiam). The government's notice of appeal was timely.[2]

## B. Application of *Georgia v. Randolph*

The sole issue on appeal is whether *Randolph* requires exclusion of evidence obtained in a warrantless search of a home after a present and objecting occupant is arrested and removed from the home and a co-occupant with authority consents to the search. The district court held that it does and granted Henderson's motion to suppress. Our review of the court's legal conclusions is de novo; factual findings and mixed questions of law and fact are reviewed for clear error. *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006).

A warrantless search of a home is considered per se unreasonable and a violation of the Fourth Amendment unless an established exception applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is

---

[2] Henderson argues that *Healy*, *Ibarra*, and *Dieter* are "no longer . . . good law" after the Supreme Court's decision in *Bowles v. Russell*, 127 S. Ct. 2360 (2007). *Bowles* considered whether a court may make an exception to a statutorily imposed time limit for filing an appeal; it did not involve the separate question of when such a time limit begins to run. The Court's opinion in *Bowles* did not mention *Healy*, *Ibarra*, or *Dieter*. Henderson asks us to "reexamine" these decisions in light of *Bowles*, but that is the Supreme Court's prerogative, not ours. *Heidelberg v. Ill. Prisoner Review Bd.*, 163 F.3d 1025, 1026 n.1 (7th Cir. 1998) (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

voluntary consent given by a person with authority. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). This includes the defendant as the occupant of the home or premises as well as any third parties who have "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004) (finding consent may be obtained "either from the person whose property is searched, or from someone, such as a spouse, with actual or apparent authority over the premises") (citations omitted).

Henderson contends that his objection to the search, like that of the defendant in *Randolph*, overrode the consent given by Patricia. In *Randolph* the defendant's wife, Janet Randolph, called police and told them her husband, Scott Randolph, had taken their son away after a domestic dispute. The couple had recently separated, and when officers arrived at the family home, Janet told them she had just returned with her son after an extended stay with her parents in Canada and that her husband was a cocaine user. Randolph arrived shortly thereafter and explained that he took his son to a neighbor's so that Janet couldn't take him away again. He denied cocaine use and refused an officer's request to search his home. The officer then turned to Janet and asked for her consent to search, which she granted. The search turned up evidence of drug use, and Randolph was charged with possession of cocaine. *Randolph*, 547 U.S. at 106-07.

Assessing the reasonableness of the search in the face of the disputed consent by husband and wife, the Supreme Court emphasized the "great significance given to widely shared social expectations, which are naturally

enough influenced by the law of property, but not controlled by its rules." *Id.* at 111. The Court observed that cotenants who disagree over the use of common quarters must resolve their disputes "through voluntary accommodation, not by appeals to authority." *Id.* at 113-14. This "want of any recognized superior authority among disagreeing tenants" suggested to the Court that the reasonableness of a disputed consent search should be evaluated from the standpoint of the social expectations of a third party faced with an invitation from one cotenant to enter and an order from another to remain outside. *Id.* "[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" *Id.* at 113. The Court noted that a police officer, as an agent of the state seeking to enter a private home, would have "no better claim to reasonableness in entering than the officer would have in the absence of any consent at all" and, like any other third party in this situation, would not sensibly enter the premises given the conflict between the tenants. *Id.* at 114. "We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120.

The *Randolph* majority endeavored to preserve the Court's previous ruling in *Matlock*, which held that a third-party consent search is reasonable even if a tenant with an interest in avoiding the search is nearby but does not in fact object. 415 U.S. at 170. In *Matlock*, the defendant was arrested in the front yard of the house where he lived with his girlfriend, Gayle, and her family members.

He was placed in a nearby squad car and was not asked for his consent to a search of the bedroom he shared with Gayle. She, however, agreed to the search, which turned up evidence of Matlock's involvement in a bank robbery. Noting that a tenant of shared premises assumes the risk that cotenants may allow common areas to be searched by the police, the Court held: "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* The rationale of *Matlock* was later extended to home searches conducted with the consent of a co-occupant whom the police reasonably, but mistakenly, believe to possess shared authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). The defendant in *Rodriguez* was present but asleep in the next room when his co-occupant gave police consent to search. *Id.* at 180.

The *Randolph* Court conceded that to maintain *Matlock* and *Rodriguez*, it was required to "draw[ ] a fine line" between a defendant who is both present and objecting and one who is either not present (though nearby) or present but not objecting: "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Randolph*, 547 U.S. at 121.

Justice Breyer concurred in *Randolph*, viewing the Court's holding as "case specific." *Id.* at 127 (Breyer, J., concurring). Fourth Amendment reasonableness, he said, admits of no bright-line rules and is governed by the "totality of the circumstances," so if "the circumstances [were] to change significantly, so should the result." *Id.* at

125-26. Justice Breyer emphasized the majority's acknowl-
edgment that police may properly enter a home, despite
a present occupant's objection, in order to protect a vic-
tim from an ongoing or imminent crime and in certain
other exigent circumstances. *Id.* at 126-27. Beyond high-
lighting the availability of exceptions for exigencies, Justice
Breyer's concurrence declared the outer limits of the
Court's holding: "The Court's opinion does not apply
where the objector is not present and objecting.*" Id.* at 126
(internal quotation marks omitted). "[W]ith these under-
standings," Justice Breyer joined the *Randolph* majority.[3]
*Id.* at 127.

Among the questions left unanswered by *Randolph* is
the one presented here: Does a refusal of consent by a
"present and objecting" resident remain effective to bar
the voluntary consent of another resident with authority
after the objector is arrested and is therefore no longer
"present and objecting"? We recently declined to extend
*Randolph* in a somewhat different context—that of a third-
party consent search conducted in the defendant's ab-
sence a few weeks after the defendant refused a request
to search his home. In *United States v. Groves*, 530 F.3d 506
(7th Cir. 2008), police responded to a 911 call regarding
shots fired in Daniel Groves's neighborhood. They located
spent shotgun shells on the ground outside Groves's
home and questioned him about the gunshots; he denied
having a gun and "unequivocally refused" the officers'

---

[3] Justice Stevens also filed a separate concurrence. *See Randolph,*
547 U.S. at 123-25. Chief Justice Roberts, joined by Justice
Scalia, dissented. *Id.* at 127-45. Justice Thomas also filed a
dissent. *Id.* at 145-49. Justice Alito did not participate, making
the final vote 5-3.

request to search his home. *Id.* at 508. A few weeks later, officers returned to the home at a time when they knew Groves would be at work but his girlfriend was likely to be there. They obtained the girlfriend's consent to search and located ammunition in Groves's nightstand. Groves was convicted of possession of a firearm and ammunition by a felon. We affirmed, rejecting Groves's argument that his girlfriend lacked authority to consent to the search and his claim that her consent was involuntary. *Id.* at 510-11, 512-13. Addressing *Randolph*, we noted that the search took place several weeks after Groves's initial refusal, he was not present when his girlfriend gave her consent, and the police "had no active role in securing [his] absence." *Id.* at 512. These facts, we held, made the case "readily distinguishable" from *Randolph*, which we characterized as "expressly disinvit[ing] anything other than the narrowest of readings." *Id.*

Our decision in *Groves* did not address the precise question presented here; the two circuits to have done so are split.[4] In *United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008), an en banc majority of the Eighth Circuit determined that *Randolph*'s holding is case specific and extends no further than its particular facts. In *Hudspeth*, police uncovered child pornography on the defendant's business computer while executing a search warrant. Believing that Hudspeth's home computer contained

---

[4] We have previously declined to apply *Randolph* to third-party consent searches where the defendant was not asked for—and therefore never refused—permission to search. *See United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir. 2007); *United States v. Parker*, 469 F.3d 1074, 1077-78 (7th Cir. 2006); *United States v. DiModica*, 468 F.3d 495, 500 (7th Cir. 2006).

more illicit material, police asked him for consent to search it. Hudspeth refused and was taken to jail. In the meantime, other officers went to Hudspeth's home and spoke with his wife, Georgia. She refused to allow the officers to search the home after being told why Hudspeth had been arrested. Officers then requested permission to take the home computer, and Georgia asked what would happen if she refused. The officers explained that they would obtain a search warrant and leave an armed guard in the home to ensure no evidence was destroyed. Georgia relented and consented to the seizure and search of the home computer, on which police later discovered more child pornography. *Id.* at 955-56.

Discussing the effect of *Randolph* on existing consent-search law, the Eighth Circuit noted that *Randolph* relied on two factors to distinguish its holding from *Matlock* and *Rodriguez*: the defendant's physical presence and immediate objection to the search. *Id.* at 959. Hudspeth was neither present nor immediately objecting when Georgia gave her consent to take the home computer. Accordingly, the Eighth Circuit concluded, "the narrow holding of *Randolph*, which repeatedly referenced the defendant's physical presence *and* immediate objection, is inapplicable here." *Id.* at 960. The court noted the *Matlock* principle that a tenant who chooses to share premises necessarily relinquishes some privacy and risks that in his absence a cotenant may allow authorities to search—even if he preemptively objected. "[T]he absent, expressly objecting co-inhabitant has assumed the risk that another co-inhabitant might permit the common area to be searched." *Id.* at 961 (internal quotation marks omitted).

The Ninth Circuit reached the opposite conclusion in *United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008). There,

the police followed two methamphetamine dealers to a rental-storage facility; they knew the defendant, Stephen Murphy, was living in one of the units with the permission of the renter, Dennis Roper. When police arrived at the unit, Murphy opened the door, and the officers could see an operating meth lab in plain view. After performing a limited protective sweep, the officers asked Murphy for consent to search, which he refused. Murphy was then arrested and taken to jail, and Roper appeared on the scene. Denying any knowledge of the lab, Roper consented in writing to a search of the unit. Citing *Randolph*, Murphy moved to suppress the evidence obtained from the search. The district court denied the motion, but the Ninth Circuit agreed with Murphy and reversed. *Id.* at 1119-20.

The government's position in *Murphy* was that *Randolph* was distinguishable because Murphy was no longer present when Roper signed the consent-to-search form, and therefore his prior objection no longer held any force. The Ninth Circuit found this distinction immaterial, holding that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant." *Id.* at 1124. The court cited a passage from *Randolph* identifying (but not resolving) the potential problem of pretextual arrests carried out " 'for the sake of avoiding a possible objection' " to search. *Id.* (quoting *Randolph*, 547 U.S. at 121). The Ninth Circuit took this inchoate concern from *Randolph* a step further, however; the court threw out an otherwise valid third-party consent search based on the prior objection of a co-occupant whose arrest and removal from the scene was legitimate, *not* a

pretext to evade the objection.[5] The court held that "[o]nce a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects." *Id.* at 1125.

_____

[5] Our dissenting colleague, like the Ninth Circuit, concludes that a third-party consent search conducted after the *valid* arrest of an objecting co-occupant violates the rule of *Randolph. See infra* p. 24 ("As the Ninth Circuit has rightly pointed out, if police may not remove a tenant in order to prevent him from objecting to a search of his home, as *Randolph* makes clear, 547 U.S. at 121, 126 S. Ct. at 1527, then 'surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made.'" (quoting *Murphy,* 516 F.3d at 1124-25)). For reasons we will explain, *see infra* pp. 15-19, we think this extends *Randolph* beyond its terms. As we have noted, the Supreme Court alluded to the potential problem of sham arrests in explaining the "fine line" it was drawing in *Randolph*. 547 U.S. at 121 ("This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules . . . .") The facts of *Randolph*, however, did not require the Court to address the matter further, and it did not do so. This passing reference to pretextual arrests carried out for the purpose of evading an objection to search was not a holding. In any event, the Court's dicta should not be overread to require the invalidation of an otherwise valid third-party consent search where the objecting tenant is removed from the home based on a *legitimate*, nonpretextual arrest. Here, Henderson was validly arrested based on probable cause to believe he had committed a domestic battery; there is no evidence to suggest he was removed from the home "for the sake of" evading his objection to the search. *Id.* at 121-22; *Groves*, 530 F.3d at 511-12.

*Hudspeth* and *Murphy* are materially indistinguishable from each other and from this case. The facts here, like those in *Hudspeth* and *Murphy*, begin like *Randolph* but end closer to *Matlock* and *Rodriguez*. Henderson was in fact present and objecting when police entered his home. After he was validly arrested and taken to the police station, however, Patricia—who unquestionably had shared authority over the home—voluntarily gave her consent and led the police on a search for evidence. Henderson argues that his objection remained in force to override Patricia's subsequent consent. He, like the Ninth Circuit, interprets *Randolph* as not confined to its circumstances, that is, as *not* limited to a disputed consent by two contemporaneously present residents with authority. On this broader reading of *Randolph*, a one-time objection by one is sufficient to permanently disable the other from *ever* validly consenting to a search of their shared premises. We think this extends *Randolph* too far. *Randolph* itself, we observed in *Groves*, "expressly disinvites" any reading broader than its specific facts.

Like the Eighth Circuit, we see the contemporaneous presence of the objecting and consenting cotenants as indispensable to the decision in *Randolph*. Indeed, the fact of a conflict between present co-occupants plays a vital role in the *Randolph* majority's "social expectations" premise; a third party, attuned to societal customs regarding shared premises, would not, "[w]ithout some very good reason," enter when faced with a disputed invitation between cotenants. *Randolph*, 547 U.S. at 113. The calculus shifts, however, when the tenant seeking to deny entry is no longer present. His objection loses its force because he is not there to enforce it, or perhaps (if we understand the Court's rationale correctly) because the

affront to his authority to assert or waive his privacy interest is no longer an issue. As between two present but disagreeing residents with authority, the tie goes to the objector; police may not search based on the consent of one in the face of "a physically present inhabitant's express refusal of consent" to search. *Id.* at 122. We do not read *Randolph* as vesting the objector with an absolute veto; nothing in the majority opinion suggests the Court was creating a rule of continuing objection.

Neither the Eighth nor the Ninth Circuit considered the limiting effect of Justice Breyer's concurrence on the scope of the majority opinion. As we have noted, Justice Breyer joined the other four members of the majority with the understanding that the Court's opinion was "case specific" and "does not apply where the objector is not present and objecting." *Id.* at 126-27 (Breyer, J., concurring) (internal quotation marks omitted). That, and the specific limiting language in the majority opinion itself, convince us that *Randolph*'s holding ought not be extended beyond the circumstances at issue there. *See id.* at 106 ("We hold that, *in the circumstances here at issue*, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.") (emphasis added).

The Ninth Circuit's decision in *Murphy* essentially reads the presence requirement out of *Randolph*, expanding its holding beyond its express terms and giving rise to many questions with no readily identifiable principles to turn to for answers. If an objecting co-occupant's presence is not required, are there any limits to the superiority or duration of his objection? What circumstances (if any) operate to reinstate a co-occupant's authority to consent to a search? May an occupant arrested or interviewed

away from the home preemptively object to a police request to search and effectively disable his co-occupants from consenting even in his absence? *Murphy*'s answer—that the objecting occupant's objection is binding until he, and only he, objectively manifests his consent to a search—ignores *Randolph*'s social-expectations foundation. A prior objection by an occupant who is no longer present would not be enough to deter a sensible third party from accepting an invitation to enter by a co-occupant who is present with authority to extend the invitation. Under these circumstances even an initially reluctant guest would feel confident he was not breaking any unwritten social rules by entering. Just as a tenant's mere presence is not enough to override his cotenant's consent, *see Rodriguez*, 497 U.S. at 170 (tenant asleep in the next room), so too his objection is not enough if he is absent from the later entry by authorities with the voluntary consent of his cotenant.

Our dissenting colleague suggests that this view of social expectations is Hobbesian: "Only in a Hobbesian world would one person's social obligations to another be limited to what the other is present and able to enforce." *Infra* p. 22. This rather overstates our analysis, which is limited to the present, narrow context of an outsider confronted with a contemporaneous disagreement between two residents with equal authority to consent to entry. In this situation, a visitor who relies on the express permission given by one resident *after* the departure of the objecting resident is not necessarily opportunistic, nor always a social outlaw. True, "adjourn[ing] to a nearby coffee shop rather than risk[ing] the wrath of the absent tenant" is one way to resolve the dilemma, *id.*, but it is hardly the *only* socially acceptable

option. *See Randolph,* 547 U.S. at 129-30 (Roberts, C.J., dissenting) ("The fact is that a wide variety of differing social situations can readily be imagined, giving rise to quite different social expectations. . . . The possible scenarios are limitless, and slight variations in the fact pattern yield vastly different expectations about whether the invitee might be expected to enter or to go away."). We know of no social convention that requires the visitor to abstain from entering once the objector is no longer on the premises; stated differently, social custom does not vest the objection with perpetual effectiveness.

The dissent also suggests, with a nod to Hobbes, that a visitor in this situation would disregard his host's express invitation out of fear of retaliation from the absent objector. *Infra* p. 22-23. To the contrary, if the circumstances provide reason for such fear, the visitor might be well justified in accepting the subsequent invitation to enter—notwithstanding the now-absent objector's wishes—in order to be of assistance to his host. Failing that, if domestic abuse was suspected and a real risk of retaliation present, the visitor might himself call the authorities, setting up a new round of questions about the continued effectiveness and transferability of the absent tenant's objection.

In the end, we need not resolve the philosophical question. Though we may disagree about the application of *Randolph*'s underlying social-expectations theory, the Court went out of its way to limit its holding to the circumstances of the case: a disputed consent by two then-present residents with authority. It is worth noting as well that consent searches are in no general sense constitutionally disfavored; recognized as "standard investigative techniques of law enforcement agencies," consent

searches are "a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth*, 412 U.S. at 228.

Our conclusion, like the Eighth Circuit's, implements *Randolph*'s limiting language and the Court's stated intent to maintain the vitality of *Matlock* and *Rodriguez*. Absent exigent circumstances, a warrantless search of a home based on a cotenant's consent is unreasonable in the face of a present tenant's express objection. Once the tenant leaves, however, social expectations shift, and the tenant assumes the risk that a cotenant may allow the police to enter even knowing that the tenant would object or continue to object if present. Both presence *and* objection by the tenant are required to render a consent search unreasonable as to him.

Here, it is undisputed that Henderson objected to the presence of the police in his home. Once he was validly arrested for domestic battery and taken to jail, however, his objection lost its force, and Patricia was free to authorize a search of the home. This she readily did. Patricia's consent rendered the warrantless search reasonable under the Fourth Amendment, and the evidence need not have been suppressed.[6] We REVERSE the district court's order suppressing evidence seized from Henderson's home and REMAND the case for further proceedings.

---

[6] Given our decision, there is no need to address the factual dispute of whether Patricia asked the police to search the home before they entered and confronted Henderson. All that matters is that she voluntarily consented after he had been arrested and removed from the scene.

ROVNER, *Circuit Judge*, dissenting. There is one and only one reason that this case is not on all fours with *Georgia v. Randolph*: When Kevin Henderson told the police to "get the fuck out" out of his house, the officers arrested and removed *him* instead. Until that moment, Henderson was both a present and actual objector to the search of his home. Had he remained on the premises, his objection would have foreclosed the police from searching the house regardless of his wife's consent; only a warrant would have broken the tie and permitted the search. My colleagues conclude that Henderson's valid arrest and removal from the scene sapped his objection of its force and allowed the police to search the house with Patricia Henderson's consent. In my view, this interprets the admittedly limited *Randolph* decision too narrowly. I would hold that Henderson's objection survived his involuntary removal from the home, thus precluding the search in the absence of a warrant. *See United States v. Murphy*, 516 F.3d 1117, 1124-25 (9th Cir. 2008); *see also United States v. Hudspeth*, 518 F.3d 954, 963-64 (8th Cir. 2008) (en banc) (Melloy, J., dissenting).

The essential purpose of the Fourth Amendment is to protect the individual from unwarranted intrusions upon his privacy. *Jones v. U.S.*, 357 U.S. 493, 498, 78 S. Ct. 1253, 1256 (1958). That privacy interest is at its strongest within the confines of one's home. *Kyllo v. U.S.*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041 (2001); *Payton v. New York*, 445 U.S. 573, 589, 100 S. Ct. 1371, 1381-82 (1980). Ordinarily, then, a warrantless entry and search of a home is considered unreasonable per se and thus contrary to the Fourth Amendment. *E.g.*, *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520 (2006). Exceptions to this rule are "jealously and carefully drawn." *Ibid.* (quoting *Jones*, 357 U.S. at 499, 78 S. Ct. at 1257).

A search by consent is, of course, one of the recognized exceptions to the warrant requirement, *id.* at 109, 126 S. Ct. at 1520, and where two people share a home, one may consent in the absence of the other, *id.* at 109-12, 126 S. Ct. at 1520-22. *Randolph*, however, makes clear that when both tenants are present at the time the police seek consent to search, and one of the tenants objects, the consent of the other does not suffice to permit the search. *Id.* at 113-17, 120, 121, 126 S. Ct. at 1522-25, 1526, 1527. The particular question that we must resolve is whether a co-tenant's objection to a search of his residence survives that tenant's arrest and removal from the home.

My colleagues treat the objecting tenant's departure from the residence as dispositive. They see the contemporaneous presence of the objecting tenant, along with his consenting co-tenant, as key to *Randolph*'s social expectations premise. The *Randolph* majority emphasized that a person calling at a residence shared by two people ordinarily would not think himself entitled to enter the premises over the express objection of a tenant standing in the doorway upon the caller's arrival, notwithstanding the invitation of the objector's co-tenant. *Id.* at 113-14, 126 S. Ct. at 1522-23. My colleagues conclude that once the objecting tenant leaves the premises, "[t]he calculus shifts[.]" *Ante* at 15. Once the objecting tenant has left the premises, they reason, "[h]is objection loses its force because he is not there to enforce it," *ante* at 15; at the same time, a visitor poses no affront to the absent tenant's authority to assert or waive his privacy interest by relying, in his absence, on the invitation of his co-tenant to enter the premises, *ante* at 15-16.

*Randolph* is a limited holding that "expressly disinvites" any application to cases with materially different facts.

*United States v. Groves*,  530 F.3d 506, 512 (7th Cir. 2008).
I therefore agree (and have written) that even after one
tenant of a shared residence has denied the police permis-
sion to search his residence, the police may return in his
absence on another occasion and search the premises on
the authority of his co-tenant's consent, so long as the
police played no role in securing his absence. *Id.* But
where the police are responsible for the objecting tenant's
removal from the premises, his objection ought to be
treated as a continuing one that trumps his co-tenant's
consent and so precludes a search of the premises unless
and until the police obtain a warrant.

Returning to *Randolph*'s social expectations paradigm,
I very much doubt that a social visitor would feel wel-
come in a shared residence once the visitor has been told
by one of the tenants to stay out, especially in the
profanity-laced manner employed by Henderson. Whether
the objecting tenant remains standing in the doorway or
proceeds to leave, the visitor now knows that in entering
the residence he will be acting contrary to the express
wishes of one of the occupants. True, once the objecting
tenant leaves, he can no longer enforce his objection by
barring the doorway. That does not mean that the visitor
will disregard the objection, however. Only in a Hobbesian
world would one person's social obligations to another
be limited to what the other is present and able to
enforce. Precisely because one regards his own home as
his castle, *see Randolph*, 547 U.S. at 115, 126 S. Ct. at 1523-
24, he will be reluctant to enter someone else's home
when he knows—when he has just been told to his face—
that one of its occupants does not wish him to be there.
However much another tenant might wish him to enter,
he cannot do so without disregarding the wishes of the

absent tenant and in doing so defying convention by entering without complete permission. And—to give Hobbes his due—even a visitor of limited social aptitude will harbor concern about what might occur (either to himself or to his host) if the objector later discovers that his wishes have been ignored. The ordinary social guest, I submit, would suggest that he and his host adjourn to a nearby coffee shop rather than risk the wrath of the absent tenant.

Moreover, the involuntary nature of the objecting tenant's removal from the premises cannot be ignored in our analysis. Courts presume that one who shares his residence with another person realizes that, in his absence, his co-tenant may invite others—including the police—into the residence. *Randolph*, 547 U.S. at 111-12, 126 S. Ct. at 1521-22 (citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974)). We say that such a person, when he chooses to leave his residence in the custody and care of his co-tenant, assumes the risk that his co-tenant may admit someone that he does not wish to be there. *Ibid.* That risk is made plain to him when he opens the door to find a police officer or any other unwelcome visitor summoned there by his co-tenant. He may bar the door to that visitor so long as he himself remains on the premises, but at some level he must know that should be choose to leave, the obnoxious visitor may be admitted in his absence. *See ibid.* And if he finds the risk to his privacy unacceptable, he is free to make alternate arrangements—to opt for a solitary abode, to choose a roommate more attuned to his own interests, or to secure any items that he does not wish a stranger to see. But when the tenant is forcibly removed from the premises after objecting to the visitor's entry, he can take no such action. He has already done all that he can do to protect

his privacy interest—he has told the visitor to leave. He has not assumed the risk that his co-tenant may subsequently admit the visitor, because all choice has been taken from him in his involuntary removal from the premises.

That Henderson's arrest and removal from his home was lawful does not alter the analysis. If the arrest were invalid, that might be an additional reason to deem the ensuing search of the home unlawful. *See Randolph*, 547 U.S. at 121, 126 S. Ct. at 1527. But the fact that police had a legitimate basis on which to take Henderson into custody does not mean that they were entitled to ignore his refusal to permit a search of his home. An individual does not lose all of his Fourth Amendment rights upon his arrest. *See Maryland v. Buie*, 494 U.S. 325, 336, 110 S. Ct. 1093, 1099 (1990) (acknowledging that individual arrested at home retains privacy interest in the house that ordinarily precludes a "top-to-bottom" search of the premises without a warrant) (citing *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034 (1969)). Before being carted off to jail, Henderson had already told the police to get out of his home and in so doing had made known his objection to a search of the premises. His arrest meant only that he was no longer present to enforce his objection, and for the reasons I have just mentioned, his involuntary absence should not be viewed as sufficient to nullify his objection. As the Ninth Circuit has rightly pointed out, if police may not remove a tenant in order to prevent him from objecting to a search of his home, as *Randolph* makes clear, 547 U.S. at 121, 126 S. Ct. at 1527, then "surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." *Murphy*, 516 F.3d at 1124-25.

In sum, the fact that Henderson voiced an objection to a search of his home when the police arrived on his doorstep was sufficient under *Randolph* to preclude the ensuing search. Mrs. Henderson's subsequent consent to the search merely produced the tie between co-tenants that *Randolph* deems insufficient to authorize a search. In the face of that tie, the police were obligated to obtain a warrant before searching the home. Given what Mrs. Henderson had told the police, I have little doubt that they could have secured such a warrant. How long Henderson's objection would have remained valid as against Mrs. Henderson's consent to search the home, and whether the police would have been entitled to return to the home at a later date during his incarceration and search the premises with her consent, are difficult questions, but not ones that we need to answer in this case. Mr. Henderson unequivocally refused to consent to a search on the very same occasion that police did search the premises, and his contemporaneous objection was enough to render the search invalid.

I respectfully dissent.